# Exhibit 31

# LIONBRIDGE

STATE OF NEW YORK      )
                       )
                       )    ss
COUNTY OF NEW YORK     )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Danish into English of the attached excerpt from Participation in

limited liability companies – the concept of shareholder in company and tax law. I affirm that the

linguist responsible for producing this translation is fluent in both the Danish and English

languages.

_____
Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _6ᵗʰ_ day of _June_ , 20 _22_ .

_____

LAURA E MUSICH
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MU6386791
Qualified in Queens County
My Commission Expires 01-28-2023

SPO.2006.17

# Participation in limited liability companies – the concept of shareholder in company law and tax law

**Pages:** 17

**Authors:** By Jakob Bundgaard, Copenhagen
Business School/Deloitte

**Author:** Jakob Bundgaard

By Jakob Bundgaard, Copenhagen Business School/Deloitte

## 1.     Introduction

An issue that is increasingly attracting attention in tax law is the question of what is meant by the concept of shareholder as an expression of participation in limited liability companies.

The delimitation of the shareholder concept is a hitherto neglected topic in Danish company and tax law literature and is also poorly dealt with in practice. In the following, a proposal will be made on the content of the concept of shareholder in terms of both company law and tax law.

The increasing practical importance of the issue and its general interest for tax law is due in particular to the fact that several tax law provisions require that a shareholder can be identified. A shareholder can then be included both as a beneficiary under tax distribution law and as an obliged party under tax obligation law. Internationally, the need for clarification arises in particular because of common tax planning techniques and different ways of structuring shareholdings, etc., under foreign law. In this respect, it is well known that shareholder rights in other countries are often shared between several persons. Such a division often occurs in the context of financing structures [Footnote 1]. Finally, it should be mentioned that the concept of a shareholder comes up in the context of changes of ownership.

## 2.     Shareholder concept in civil law

### 2.1. General

The shareholder concept is undoubtedly of great relevance in tax law. Limited liability companies are a legal fiction which cannot exist without legal regulation. For this reason, it is essential to know the civil law content of the shareholder concept.

In the following, the content of the concept is analyzed in the field of company law. It is worth noting that the shareholder concept has not received much attention in Danish corporate law. However, the

shareholder concept is relevant in civil law in connection with: (1) the extent to which shareholder rights can be split or divided and (2) in connection with a change of ownership [Footnote 2].

[…]

[…]

### 2.5. The concept of shareholder in the event of a change of ownership

The location of shareholder rights is of great importance in the context of ownership changes. Thus, it has to be assessed whether the rights during a transitional period lie with the selling shareholder, the acquiring shareholder or are, so to speak, "dead" for a period [Footnote 61]. This question must be decided for each type of right separately. The <u>Danish Companies Act</u> does not contain criteria for such an assessment. The starting point must be that the administrative rights cease when the ownership ceases [Footnote 62]. It is possible that a change of ownership has not been notified to the company, so that the seller is still registered as a shareholder in the share

register, so that he can participate in the general meeting on this basis. This raises the question of whether the shareholders' register gives the seller legitimacy in terms of administrative rights. The question must be answered in the negative, since participation on the above basis must be regarded as an error in the proceedings of the general meeting [Footnote 63]. In view of the above, it seems reasonable to assume that the termination of the seller's right to exercise the administrative rights should at the same time entail the corresponding right of the seller, so that the right is always vested in one or the other. But this is not the case. Rights can be laid to rest for a period of time. The entry of the new owner depends on the basis of the acquisition and the situation. As a general rule, the acquirer's powers shall be exercised where there is a basis for him to exercise his ownership rights directly and where his acquisition has also been notified to the company and, where appropriate, documented vis-à-vis the company. Any terms of the company's articles of association may alter this [Footnote 64].

With regards to financial rights, the legal situation is somewhat different from that of administrative rights. The interests of the other shareholders take a back seat, while the interests of the shareholder's freedom of action are more central. The solution is therefore also different. § 19 of the Danish Sale of Goods Act regulates the seller's right to dividends. The effect of this provision is that the purchase of a share includes the dividend which was not due at the time of the conclusion of the contract. Accrual is not enough, there must be a decision to distribute, and the claim must be due. When the seller has a claim against the buyer for dividends, he can assert the claim against the company even if his right to the share has expired. Even if the seller has lost the right to receive dividends, he may be entitled to receive dividends with releasing effect for the company, cf. § 24 of the Danish Companies Act.

§ 19 of the Danish Sale of Goods Act further stipulates that the buyer benefits if the share is accompanied by a right to subscribe for new shares. This means that the seller has the right to subscribe for new shares if the right arose before the purchase, which presumably means that the capital increase decision must have been made before the purchase.

### 3. Tax relevance of the shareholder concept

The presence of a shareholder for tax purposes is required under several tax law provisions. This applies in particular to the rules of the Capital Gains Tax Act, the special rules on tax-neutral restructurings in the Merger Tax Act, the rules on the taxation of dividends, etc.

As mentioned above, there is no general or specific tax law shareholder concept, and no clarification of this concept is provided in the relevant tax law provisions. The analysis of the shareholder concept in tax law must therefore be based on the practice which has developed in the resolution of specific issues, since it cannot simply be assumed that tax law practice has developed in absolute coherence with the civil law basis of the concept. Against this background, an attempt will be made to derive general features of the tax law shareholder concept in order to assess whether there is a specific definition of shareholder in practice which may differ from the civil law shareholder concept.

Who is a shareholder is often also a question of identifying the right income recipient. Where tax law presupposes the presence of a shareholder position, the relationship can be formulated in several respects as the proper recipient of income is the shareholder.

There is no tax law definition of a shareholder. However, bearing in mind that limited liability companies are a legal fiction to which tax law must necessarily relate, a shareholder may, for tax law purposes, only further distinguish itself from the civil law definition of the same. The shareholder concept must therefore be interpreted in accordance with the civil law shareholder concept [Footnote 65].

### 4. The shareholder concept in tax jurisprudence

[…]

SPO.2006.17

# Deltagelse i kapitalselskaber - aktionærbegrebet i selskabsretlig og skatteretlig belysning

**Sidetal:** 17

**Forfattere:** Af Jakob Bundgaard, Copenhagen Business School / Deloitte

**Forfatter:** Jakob Bundgaard

Af Jakob Bundgaard, Copenhagen Business School / Deloitte

## 1. Indledning

En problemstilling, der i stigende omfang tiltager sig skatteretlig opmærksomhed, er spørgsmålet om, hvad der ligger i aktionærbegrebet som udtryk for deltagelse i kapitalselskaber.

Afgrænsningen af aktionærbegrebet er et hidtil upåagtet emne i dansk selskabs- og skatteretlig litteratur, og er tillige stedmoderligt behandlet i praksis. I det følgende skal der gives et bud på aktionærbegrebets indhold i såvel selskabsretlig- som skatteretlig henseende.

Problemstillingens stigende praktiske betydning og generelle skatteretlige interesse skyldes særligt, at det i adskillige skatteretlige lovbestemmelser forudsættes, at en aktionær/anpartshaver kan identificeres. En aktionær kan da indgå såvel som rettighedssubjekt i henhold til skatteretlig fordelslovgivning og som pligtsubjekt i henhold til den skatteretlige pligtlovgivning. Internationalt opstår afklaringsbehovet særligt på grund af almindeligt forekommende skatteplanlægningsteknikker og forskellige måder at strukturere aktiebesiddelser mv. i udenlandsk ret. Det er herved velkendt, at aktionærrettigheder i andre lande ofte deles mellem flere personer. En sådan opsplitning forekommer ofte i forbindelse med finansieringsstrukturer [Note 1]. Endelig kan det nævnes, at aktionærbegrebet aktualiseres i forbindelse med ejerskifter.

## 2. Det civilretlige aktionærbegreb

### 2.1. Generelt

Aktionærbegrebet har utvivlsomt stor skatteretlig relevans. Selskaber af aktieselskabstypen udgør en juridisk fiktion, der ikke kan bestå uden den retlige normering heraf. Af denne årsag er det af central betydning at kende til det civilretlige indhold af aktionærbegrebet.

I det følgende analyseres begrebets indhold på selskabsrettens område. Det er værd at forudskikke, at aktionærbegrebet i dansk selskabsret ikke har haft nævneværdig bevågenhed. Aktionærbegrebet har dog

relevans i civilretlig henseende i forbindelse med: (1) spørgsmålet om, hvorvidt aktionærrettighederne kan udspaltes eller splittes samt (2) i forbindelse med ejerskifte [Note 2].

Begrebet "aktie" anvendes i aktieselskabsloven i flere forskellige betydninger. En aktie er udtryk for, at indehaveren ejer en ideel andel af selskabets egenkapital [Note 3]. Aktieselskabsloven benytter begrebet "aktionær" men indeholder ikke nogen definition heraf [Note 4]. Reguleringen er i stedet koncentreret om forskellige rettigheder og pligter i selskabet - aktionærbeføjelserne [Note 5]. En aktionærs rettigheder og pligter fremgår dels af selskabslovene, dels af selskabets vedtægter samt en eventuel aktionæroverenskomst [Note 6].

Et aktionærforhold etableres gennem de selskabsretlige regler om stiftelse og kapitalforhøjelse. Så længe rettighederne ikke overføres til andre retssubjekter, opstår der ingen konkurrence mellem forskellige retssubjekter om, hvem der er ejer af aktierne [Note 7].

Der sondres typisk mellem forvaltningsmæssige (organisatoriske) og økonomiske aktionærrettigheder/beføjelser ved beskrivelsen af indholdet i en aktionærposition. Sondringen er ikke klar, idet der kan ligge en betydelig økonomisk værdi i de forvaltningsmæssige beføjelser, ligesom de økonomiske beføjelser har forvaltningsmæssige aspekter [Note 8]. Sondringen er ikke direkte lovfæstet, men kan udledes af ASL § 27 [Note 9].

*Forvaltningsmæssige beføjelser* drejer sig om aktionærens indflydelse på forvaltningen (administrationen) af selskabet. Eftersom aktionærer grundlæggende kun udøver deres indflydelse via generalforsamlingen, jf. ASL § 65, stk. 1, angår forvaltningsbeføjelserne alle spørgsmål om, hvordan aktionærerne vil anvende deres stemmeret på generalforsamlingsniveau i selskabet [Note 10]. En akties forvaltningsmæssig beføjelser udgør retten til at møde på generalforsamlingen, jf. ASL § 65, taleretten på generalforsamlingen, jf. ASL § 65, stk. 2, retten til at afgive stemmer ved denne generalforsamling jf. ASL § 67, retten til at møde ved fuldmægtig eller rådgiver, jf. ASL § 66, stk. 1, retten til at indkalde til ekstraordinær generalforsamling, jf. ASL § 70, retten til at få et bestemt emne med på generalforsamlingen, jf. ASL § 71, retten til at anfægte en truffet generalforsamlingsbeslutning i henhold til ASL § 81, retten til granskning, jf. ASL § 86 [Note 11], retten til opløsning af selskabet, jf. ASL § 119, samt retten til søgsmål mod ledelsen på grund af erstatningsansvar, jf. ASL § 144, stk. 3.

Ved siden af de forvaltningsmæssige beføjelser er der til den enkelte aktie knyttet en række *økonomiske beføjelser*. Også de økonomiske beføjelser kan defineres med udgangspunkt i ASL § 27, der angiver eksempler på sådanne økonomiske beføjelser. En aktionærs økonomiske beføjelser kan defineres som retten til at eje eller modtage en efter aktiernes størrelse forholdsmæssig del af selskabsformuen [Note 12]. Herefter omfatter de økonomiske rettigheder alle de måder, hvorpå selskabets midler kan uddeles, jf. ASL § 109, herunder retten til at modtage udbytte på en aktie, retten til at modtage provenu ved selskabets likvidation eller ved en kapitalnedsættelse, retten til at modtage fondsaktier ved en fondsemission, jf. ASL § 29, samt den fortegningsret, der som udgangspunkt tilkommer samtlige aktionærer ved en kapitalforhøjelse, jf. ASL § 30, stk. 1. Det er det selskabsretlige udgangspunkt, at alle aktionærer har lige adgang til de økonomiske beføjelser, jf. lighedsgrundsætningen i ASL § 17. Som en økonomisk beføjelse må tillige ses maskeret udbytte, uanset de skatteretlige konsekvenser [Note 13].

Endelig kan nævnes adgangen til at disponere over selve aktien - *dispositionsbeføjelserne*. Disse beføjelser følger af selve ejendomsretten til aktien [Note 14]. Der er herved begrebsmæssigt ikke tale om udøvelse af en ret i selskabet. Udgangspunktet er i denne henseende, at aktionæren har ret til at sælge, pantsætte, overlade brugsretten til, indgå udbytteaftaler og stemmeretsaftaler vedrørende aktien, jf. ASL § 18 [Note 15]. Særligt vedrørende *pantsætning* kan bemærkes, at de forvaltningsmæssige rettigheder, der er knyttet til aktien,

forbliver hos pantsætteren, med mindre andet er aftalt [Note 16]. Der kan gyldigt træffes aftale om, at panthaver kan udnytte stemmeretten de pantsatte aktier, indtil panthaver er fyldestgjort [Note 17].

Indholdet af det civilretlige aktionærbegreb fremkommer derved indirekte, idet en aktionær kan siges at være den, som udøver de rettigheder og pligter, som er knyttet til en eller flere aktier. Idet råderetten over aktionærbeføjelserne som udgangspunkt ligger hos ejeren af aktierne, kan beskrivelsen forenkles [Note 18]. *Således er en aktionær den, der har ejendomsretten til en eller flere aktier.* [Note 19] *Imidlertid forholder det sig sådan, at det ikke altid er ejeren af en aktie, der kan udnytte en aktionærbeføjelse.* Det er en vigtig erkendelse, at der ikke nødvendigvis er sammenfald mellem ejerskabet til en aktie og udøvelsen af en aktionærbeføjelse [Note 20]. Hermed adskiller det anvendte aktionærbegreb sig fra den forståelse, som *Hugo P. Martre* lægger til grund [Note 21]. Denne forfatter har således argumenteret for, at selskabslovgivningens særskilte regulering af de forskellige aktionærbeføjelser indebære, at aktionærbegrebet i civilretlig henseende antager en *funktionel karakter.* Principielt kan det siges, at vilkårene, for at kunne udøve aktionærbeføjelserne, kunne fastlægges grundlag af reguleringen af det aktuelle spørgsmål. Aktionærbegrebet kan herved siges at have et forskelligt indhold i forskellige relationer.

En aktionær er ikke nødvendigvis, den som kan udøve en aktionærbeføjelse. Som nævnt kan aktionærbeføjelser i vidt omfang splittes fra en aktie, og det kan være relevant at sondre mellem de rettigheder, der er knyttet til den enkelte aktie, og de rettigheder, som faktisk kan udøves af den aktionær, der ejer aktien [Note 22]. Tilsvarende er ejerskabet i visse henseender ikke uden videre tilstrækkeligt til at udløse en konkret aktionærbeføjelse, jf. eksempelvis kupreglen i ASL § 67. stk. 2. Aktionæren må være ejeren af aktien, og denne ejer vil typisk være i besiddelse af en række centrale forvaltningsmæssige beføjelser [Note 23]. Det også have formodningen mod sig, at et fuldstændigt sprogligt identisk begreb intradisciplinært i selskabsretten tillægges forskelligt indhold.

## 2.2. Opsplitning af aktionærbeføjelser

Såvel civilretligt som skatteretligt er det af stor betydning, om aktionærbeføjelser kan deles mellem flere parter. Der kan ligge legitime behov bag et sådant ønske [Note 24]. I tilfælde af splitning af aktionærrettigheder bliver problemstillingen, hvem der efterfølgende skal anses for at være aktionær og formentlig dermed rettighedssubjektet i forhold til den konkrete aktionærbeføjelse.

I dansk ret er det almindeligt anerkendt, at aktionærbeføjelserne i en vis udstrækning kan splittes eller fordeles mellem flere rettighedshavere [Note 25]. Det antages, at såvel selskabet som den enkelte aktionær kan splitte rettighederne. Hermed ophører aktionærpositionen ikke, men i stedet antages det, at der er sket afståelse af begrænsede rettigheder over aktien [Note 26]. Aktieselskabsloven indeholder dog ingen almen regel om adgangen til at adskille de enkelte rettigheder fra aktien. I hvilken udstrækning dette herefter kan finde sted, bero en konkret fortolkning af den bestemmelse, der hjemler den aktuelle beføjelse [Note 27]. De generelle hensyn til minoritetsbeskyttelse, ønsker om aktionærernes interesse i selskabet gennem aktivt ejerskab, værn mod misbrug mv. har ledt til en række selskabsretlige begrænsninger i adgangen til at splitte rettighederne fra aktien [Note 28].

længe opsplitningen af aktionærbeføjelser sker i overensstemmelse med de juridiske rammer som opstilles i aktieselskabsloven, vil der i almindelighed ikke være anledning til at anse en begrænset rettighedshaver som aktionær. Derimod kan det være aktuelt at anse den begrænsede rettighedshaver som selvstændigt berettiget efter de bestemmelser, der som udgangspunkt alene gælder for aktionærer [Note 29].

Et aktieselskab kan dog ikke splitte af *forvaltningsmæssig beføjelser* fra aktierne. Et selskab kan for eksempel ikke oprette en særlig ret for en ikke-aktionær til at kræve sager behandlet selskabets generalforsamling, og kan heller ikke oprette en særlig ret for en ikke aktionær til at stemme generalforsamlingen [Note 30].

Tilsvarende kan en aktionær som udgangspunkt ikke overlade en anden person sine forvaltningsmæssige beføjelser i selskabet uden at overdrage selve aktien [Note 31]. Det nævnte udtrykker på det principielle plan en retssætning om aktiens enhed eller udelelighed [Note 32].

Dog kan stemmeretten adskilles fra ejendomsretten [Note 33]. Særlige omstændigheder kan således medføre, at den, der afgiver stemme på generalforsamlingen, ikke er identisk med den, der ejer den pågældende aktiepost. Midlertidig udøvelse af en andens stemmeret hjemles af fuldmagtsreglerne i ASL § 66 [Note 34]. Mere permanent adskillelse af aktieret og stemmeret accepteres, hvis denne er rimeligt begrundet [Note 35].

Derimod kan et aktieselskab i betydelig udstrækning gøre de *økonomiske beføjelser* til selvstændige rettigheder eller knytte dem til andre positioner end aktionærpositionen [Note 36]. Tilsvarende kan en aktionær overdrage de økonomiske rettigheder særskilt. Denne adgang synes at bero på en udvidende fortolkning af de relevante selskabsretlige regler, idet disse ofte foreskriver at have virkning for aktionærer, jf. eksempelvis ASL § 109 om udbytte.

ASL § 27 synes da også at forudsætte, at de økonomiske beføjelser kan splittes fra en aktie. Af bestemmelsen fremgår, at erhververen af en *navneaktie* ikke kan udøve de rettigheder, som tilkommer en aktionær, medmindre denne er noteret i aktiebogen, eller har anmeldt og dokumenteret (evt. ved fremsendelse af købsnota eller depotudskrift) sin anmeldelse. Dette gælder dog ikke retten til udbytte og andre udbetalinger og retten til nye aktier ved kapitalforhøjelse. Med andre ord fratages erhververens forvaltningsmæssige beføjelser, hvis ikke overdragelsen noteres i aktiebogen. Ønsker erhververen at udøve disse beføjelser, skal der ske notering i aktiebogen, idet erhververen hermed bliver legitimeret over for selskabet til at udøve de forvaltningsmæssige beføjelser, som er knyttet til aktien. Derimod fremgår det, at de økonomiske beføjelser bevares intakt, på trods af den manglende notering.

For *ihændehaveraktier* antages det, at aktionærens legitimation overfor selskabet følger de almindelige regler om legitimation for negotiable dokumenter. Dette indebærer, at aktionærbeføjelserne tilkommer den, som fysisk har aktiebrevet i hænde (eller foreviser depotudskrift el.lign.). Civilretligt kan selskabet betale udbytte med frigørende virkning til den, der har et aktiebrev i hænde, medmindre selskabet vidste, at vedkommende ikke længere var berettiget til at modtage udbytte, jf. GBL § 19 analogt [Note 37]. Det følger endvidere af GBL § 20, stk. 1, at selskabet med frigørende virkning kan udbetale udbytte til den hidtidige aktionær, uanset om vedkommende har overdraget aktien, såfremt selskabet ikke vidste eller burde vide, at aktien var overdraget [Note 38].

## 2.3. Om registrering af aktionærforhold herunder aktiebogens betydning

I skatteretlig praksis baseres nogen rådgivning på en fejlagtig opfattelse af registrering over aktionærpositioner. Det er derfor vigtigt at forstå det aktieretlige registreringssystem.

Generelt kan ejerforholdet til en aktie afhængigt af de konkrete omstændigheder være registreret fem forskellige steder: et kontoførende institut, Værdipapircentralen, aktiebogen, storaktionærfortegnelsen samt købs- og salgsbogen [Note 39]. Da registreringerne tjener forskellige formål, er der ikke nødvendigvis overensstemmelse mellem disse. Tavshedsforskrifter samt regler om registrenes tilgængelighed indebærer, at der kun er begrænset mulighed for at sammenholde de registrerede oplysninger [Note 40].

Aktiebogen indeholder oplysninger om aktionærerne, men er ikke nødvendigvis en fuldstændig og ajourført fortegnelse over aktionærerne i selskabet [Note 41]. Herved kan man ikke uden videre fæste lid til et selskabs aktiebog [Note 42]. Ihændehaveraktiernes ejermænd kender selskabet kun, hvis aktionæren har ladet alle sine aktier notere på navn, jf. ASL § 24, stk. 1. Aktieselskabsloven kræver kun, at der oprettes en aktiebog ved selskabets stiftelse, og at der for navneaktier sker indførelse af aktionærernes navne i aktiebogen, jf. ASL §

25, stk. 1, men loven kræver ikke, at køberen af navneaktier lader sine aktier notere på navn i aktiebogen, som betingelse for at kunne udøve sine rettigheder som aktionær. Det er tilstrækkeligt, at aktionæren melder sig og dokumenter sin ret til aktierne, jf. ASL §§ 27 og 67, stk. 2.

Et selskab kan have brug for at kende alle sine aktionærers identitet, for at kunne administrere bestemmelser i vedtægterne. I tilfælde, hvor kontrol med at vedtægterne er overholdt, kræver kendskab til ejernes identitet, har selskabet formentlig krav på oplysning om de virkelige aktionærers navne [Note 43].

Bort set fra sådanne tilfælde, og reglen i ASL § 25 a (om aktiebogen) kan aktionæren forblive anonym overfor selskabet, medmindre aktionæren er storaktionær omfattet af ASL §§ 28a-b og VPHL § 29.

## 2.4. Eksempler på opsplitning af aktionærbeføjelser - nominees og depositary receipts

De retlige aspekter af den såkaldte nominee-ordning illustrerer på bedste vis problemstillingen vedrørende opsplitning af aktionærbeføjelser. Anvendelsen af nominees er inspireret af det britiske aktieretssystem, hvor der alene kan udstedes navneaktier. Nominee-ordningen opstod på grund af behovet for en vis anonymitet, og nominees er en måde at opnå dette på [Note 44]. En *"nominee shareholder"* er *"...a person, partnership or corporation who holds the legal interest in shares in the capital of a corporation on behalf of the beneficial owner ..."* [Note 45].

Nominee-ordningen indebærer, at selskabet har kendskab til en person, som eksempelvis kan modtage udbytte og anden betaling samt aktionæroplysninger på vegne af den egentlige aktionær. I alle tilfælde medfører nominee-ordningen et yderligere lag af anonymitet, og omverdenen ved ikke nødvendigvis, at den optrædende er nominee og ikke den virkelige ejer. Det er således accepteret, at nominees anvendes til repræsentation i økonomisk henseende [Note 46].

Såfremt *den virkelige ejer ønsker forvaltningsmæssige rettigheder*, og selskabet *har kendskab* til nominee-forholdet, vil selskabet - hvis der er tale om navneaktier - kunne kræve, at den egentlige ejer enten er noteret i aktiebogen, eller har givet en fuldmagt til den nominee, der er anført i aktiebogen, jf. ASL § 27 hhv. ASL § 66. Har selskabet derimod *ikke kendskab* til nominee-forholdet, er det i praksis muligt for nomineen at optræde som ejer og således også udøve de forvaltningsmæssige rettigheder uden at være i besiddelse af en fuldmagt [Note 47]. Retsstillingen i det interne forhold afhænger af den indgåede aftale mellem parterne.

Nominee-ordningen accepteres som lovlig i dansk værdipapirhandels- selskabsret og obligationsret [Note 48]. Således forudsættes det i VPHL § 72, stk. 2, at en kontohaver i en værdipapircentral kan føre en konto på vegne af en eller flere ejere. En tilsvarende forudsætning fremgår af § 31, stk. 2 i bekendtgørelse om registrering af fondsaktiver i en værdipapircentral [Note 49]. Forudsætningen for denne anerkendelse er blot, at forholdet registreres på kontoen, jf. VPHL § 72, stk. 2 [Note 50]. En nominee-ordning er således lovlig og almindeligt anerkendt i dansk ret [Note 51]. Den registrerede kontoindehaver er således ikke nødvendigvis ejeren af kontoens fondsaktiver, men der gives oplysning herom [Note 52]. Nomineeforhold vil dog ofte ikke være kendt af selskabet eller af offentligheden [Note 53]. En tilsvarende oplysning gives ikke ved notering i selskabets aktiebog, idet aktionærerne ikke heri er forpligtet til at angive, hvorvidt den angivne person er den reelle ejer eller en nominee.

Aktieselskabsloven indeholder ikke et krav om, at nomineeforholdet skal fremgå af aktiebogen. Dette udgangspunkt fraviges, hvis derimod aktionæren har en aktiebesiddelse, der medfører at denne må opfattes som storaktionær (dvs. mindst 5% af stemmerettighederne eller 5% af aktiekapitalen.), jf. ASL § 28 a [Note 54]. Herefter gælder der i henhold til ASL § 28 b, et krav om, at den *reelle ejer* skal noteres i selskabets aktiebog [Note 55], med angivelse af navn, bopæl eller hjemsted [Note 56]. Nogen automatik ligger der ikke heri,

og selskabet vil efter omstændighederne kunne kræve den fornødne dokumentation for den anmeldte aktiebesiddelse [Note 57]. Undlader man at efterkomme oplysningskravene, er dette bødebelagt, jf. ASL § 161.

Beslægtet med nominee-ordningen er de såkaldte *Depositary Reciepts*. Disse findes i hvert tilfælde i følgende varianter: American Depositary Receipts (ADR), Global Depositary Receipts (GDR), New York Shares og EURO Depositary Receipts. De to førstnævnte benyttes synonymt.

En ADR/GDR er udtryk for et bevis for en ejerandel i et selskab, som ikke er beliggende i USA. En typisk definition lyder: *"...a U.S. dollar denominated form of equity ownership in a non-U.S. company. It represents the foreign shares of the company held on deposit by a custodian bank in the company's home country and carries the corporate and economic rights of the foreign shares, subject to the terms specified on the ADR certificate."* [Note 58]. Eller *"...Depositary Receipts are negotiable certificates that represent a non-U.S. company's publicly traded equity or debt. Depositary Receipts are legal U.S. securities that trade freely on a major exchange or in the over-the-counter (OTC) market in U.S. dollars, pay dividends or interests in dollars, and settle, clear, and transfer according to standard U.S. practices. The Depositary Receipt evidences the home market security which trades in a foreign contry and is custodized with a local bank, called the custodian..."* [Note 59]. Synonymt hermed benyttes begrebet American Depositary Shares (ADS).

ADR's udstedes ved, at de faktiske aktier, som en ADR repræsenterer, opkøbes af en bank (Depositary Bank) og deponeres hos en custodian i samme land [Note 60]. Samtidig hermed udsteder Depositary Bank, Depositary Receipts som gennem mægler leveres til de enkelte investorer.

Fra en selskabsvinkel er formålet med disse instrumenter overvejende at stimulere investorinteressen for aktierne i et selskab beliggende uden for USA. Samtidig benyttes ADR's til at udvide aktionærkredsen, forøge likviditeten og selskabets synlighed. Fra investorside er formålet *at* nedbringe omkostninger, *at* sikre afkast i USD, *at* muliggøre udenlandske investeringer for visse investorer som ellers er afskåret herfra, *at* sikre simplicitet samt *at* nedbringe risiko. Helt overordnet er fordelen ved Depositary Receipts, at ikke amerikanske aktier så at sige "amerikaniseres" for at blive tilpasset det amerikanske marked. I amerikansk ret anses ADR's for at udgøre U.S. Securities i henhold til 1933 Securities Act. Hermed afskæres ingen fra et eje Depositary Receipts.

Der er næppe tvivl om, at indehaveren af en ADR tillige er ejer af den underliggende aktie. Således gælder det om de økonomiske aktionærbeføjelser i henhold til en standardaftale på området, at disse udøves af Depositary, men at denne videreudlodder udbytter til ejeren med fradrag af omkostninger og eventuelle skatter. Depositary skal samtidig sørge for at modtagne beløb veksles til USD. For så vidt angår stemmeretten gælder det, at udøvelsen af denne er dikteres af Depositary-indehaveren.

Depositaty Receipts optræder også i det praktiske retsliv i Danmark, hvorfor også en skatteretlig kvalifikation er nødvendig. Dette er særligt tilfældet, hvor danske selskaber benytter sig af instrumentet (Novo, Novozymes, Lundbeck, TDC), eller hvor sådanne indgår i internationale strukturer, eksempelvis hvor der indgår et dansk holdingselskab i internationale koncernstrukturer, mellem US investorer og ADR-udstedende selskaber.

## 2.5. Aktionærbegrebet ved ejerskifte

Placeringen af aktionærbeføjelser har stor betydning i forbindelse med ejerskifte. Således må det vurderes, om rettighederne i en overgangsperiode ligger hos den sælgende aktionær, den erhvervende aktionær eller så at sige ligger "døde" for en periode [Note 61]. Afgørelsen af dette spørgsmål må ske for hver rettighedstype for sig. Aktieselskabsloven indeholder ikke kriterier for en sådan bedømmelse. Udgangspunktet må være, at de *forvaltningsmæssige beføjelser* ophører, når ejendomsretten ophører [Note 62]. Det kan tænkes, at et ejerskifte ikke er meldt til selskabet, således at sælger fortsat står registreret som aktionær i aktiebogen, sådan at han

på dette grundlag kan deltage i generalforsamlingen. Dette rejser spørgsmålet om, hvorvidt aktionærbogen giver sælger legitimation med hensyn til forvaltningsmæssige beføjelser. Spørgsmålet må besvares afkræftende, idet deltagelse på det nævnte grundlag må anses som en fejl ved generalforsamlingens sagsbehandling [Note 63] . Som følge af det nævnte er det en nærliggende tanke, at ophøret af sælgers ret til at udøve de forvaltningsmæssige beføjelser samtidig må medføre indtræden af sælgers tilsvarende ret, sådan at rettigheden altid er hos enten den ene eller den anden. Men sådan forholder det sig ikke. Rettighederne kan blive lagt døde i en vis periode. Indtræden af den nye ejers adgang afhænger af grundlaget for erhvervelsen og situationen. I almindelighed indtræder erhververens beføjelser, når der foreligger et grundlag for, at han umiddelbart kan træde ind i ejerbeføjelserne og, at hans erhvervelse desuden er meddelt selskabet og eventuelt dokumenteret overfor dette. Eventuelle vilkår i selskabets vedtægter kan ændre dette [Note 64] .

For så vidt angår de *økonomiske beføjelser*, er retsstillingen en noget anden end ved de forvaltningsmæssige rettigheder. Hensynet til de øvrige aktionærer træder i baggrunden, mens hensynet til aktionærens handlefrihed står mere centralt. Løsningen er derfor også en anden. Købelovens § 19 regulerer som udgangspunkt sælgers ret til udbytte. Bestemmelsen medfører, at køb af en aktie omfatter det udbytte, som ikke var *forfaldent* på tidspunktet for aftalens indgåelse. Optjening er ikke nok, der skal foreligge beslutning om udlodning, og kravet skal være forfaldent. Når sælger i forhold til køber har et krav på udbytte, kan han gøre kravet gældende mod selskabet, selv om hans ret til aktien er ophørt. Selvom sælger har mistet retten til at oppebære udbytte, kan han være legitimeret til at modtage udbytte med frigørende virkning for selskabet, jf. ASL § 24.

KBL § 19 foreskriver endvidere, at køberen nyder godt af, hvis der til aktien er knyttet en ret til at tegne nye aktier. Dermed har sælgeren adgang til at tegne nye aktier, såfremt adgangen er indtrådt før købet, hvilket formentlig vil sige, at kapitalforhøjelsesbeslutningen skal være truffet før købet.

## 3. Aktionærbegrebets skatteretlige relevans

Tilstedeværelsen af en aktionær i skatteretlig henseende er påkrævet i henhold til adskillige skatteretlige lovbestemmelser. Dette gælder navnlig aktieavancebeskatningslovens regelsæt, de særlige regler om skatteneutrale omstruktureringer i fusionsskatteloven, udbyttebeskatningsregler osv..

Som nævnt findes der ikke noget generelt eller specifikt skatteretligt aktionærbegreb, og der findes ikke i forarbejder til de relevante skatteretlige bestemmelser en nærmere afklaring heraf. Analysen af skatterettens aktionærbegreb må derfor tage udgangspunkt i den praksis, der har udformet sig i forbindelse med løsningen af konkrete problemstillinger, idet det ikke uden videre kan lægges til grund, at den skatteretlige praksis har udviklet sig i absolut samhørighed med begrebets civilretlige udgangspunkt. På denne baggrund skal det forsøges at udlede generelle træk af skatterettens aktionærbegreb med henblik på at vurdere, om der findes en særlig praksisskabt aktionærdefinition, der eventuelt afviger fra civilrettens aktionærbegreb.

Hvem der er aktionær, er ofte også et spørgsmål om at udpege rette indkomstmodtager. Hvor skattelovgivningen forudsætter tilstedeværelsen af en aktionærposition, kan forholdet i flere henseender formuleres sådan, at rette indkomstmodtager til en indtægt er aktionæren.

Der findes ikke nogen skatteretlig definition af en aktionær. Når der imidlertid henses til, at aktieselskaber er en juridisk fiktion, som skatteretten nødvendigvis må forholde sig til, kan en aktionær i skatteretlig henseende ikke uden videre adskille sig fra den civilretlige afgrænsning af samme. Aktionærbegrebet må herefter fortolkes i overensstemmelse med civilrettens aktionærbegreb [Note 65] .

## 4. Aktionærbegrebet i skatteretlig retspraksis

## 4.1. Ophør og indtræden af aktionærforholdet

**Almindelige betragtninger**

Som nævnt findes der ikke nogen direkte skatteretlig aktionærdefinition. I visse situationer bliver det i sidste ende et *bevisspørgsmål*, om der foreligger den fornødne aktionærstatus [Note 66]

Aktiebegrebet i aktieavancebeskatningsloven omfatter både aktier i danske aktieselskaber og aktier i udenlandske selskaber, der svarer til danske aktie- og anpartsselskaber [Note 67]. Den præcise afgrænsning af aktiebegrebet er ikke så væsentlig, da loven også finder anvendelse på lignende værdipapirer [Note 68]. Dog er det under alle omstændigheder nødvendigt at fastslå, hvad der skal forstås ved en aktionær mv. samt at fastslå, hvornår en sådan position ophører henholdsvis indtræder. Ved tegning af danske aktier er en registrering af kapitalforhøjelsen hos Erhvervs- og Selskabsstyrelsen en nødvendighed for at anerkende aktiebesiddelsen såvel i selskabsretlig som i skatteretlig henseende [Note 69].

Det forudsættes i aktieavancebeskatningsloven, at skattepligten ved aktieafståelser påhviler en aktionær eller anpartshaver mv. [Note 70] Det ligger implicit i samtlige lovens regler, at der er tale om et aktionærforhold. Selve aktionærbegrebet er imidlertid ikke afklaret i loven, dennes forarbejder eller andre fortolkningsbidrag. Der findes som nævnt ikke meget vejledning til forståelsen af selve aktionærbegrebet [Note 71]. Dog må det af sammenhængen udledes, at en aktionær er "ejeren" af en aktie. Dette fremgår også af ABL § 2, stk. 1, og § 4, stk. 1, hvorefter der tales om "*erhvervede*" korttids- og langtidsaktier. Det fastslås endvidere i ABL § 1, stk. 4, in fine, at skattepligten i henhold til loven tillige påhviler SEL § 1, stk. 1, nr. 6-foreninger i det omfang de "*besidder*" aktier, der er omfattet af deres erhvervsmæssige virksomhed og ABL § 5, stk. 2 "*...hvis en aktionær ejer aktier...*".

Det må lægges til grund, at ABL som udgangspunkt opererer med et civilretligt aktionærbegreb og herunder tillige med et civilretligt ejendomsretskriterium. Det antages til tider, at skatteretten har udviklet sit eget ejendomsretskriterium. En sådan konstatering udspringer blandt andet af Højesterets dom i TfS 2000, 1011 H*Simon Bent Sørensen*. Dommens resultatet tages af *Leif Sundby* [Note 72], *Erik Werlauff* [Note 73] og *Aage Michelsen* [Note 74] til indtægt for eksistensen af et selvstændigt skatteretligt ejendomsbegreb, der kan medføre en afvigelse fra det civilretlige ejerskab, som parterne har aftalt [Note 75]. Hvori forskellen nærmere består, er ikke analyseret, idet forfatterne så vidt ses alene når deres resultat med henvisning til den foretagne konkrete realitetsbedømmelse. En sådan er vel næppe alene karakteristisk for ejendomsretsbegrebet. Dog er der enighed om, at ejendomsretsbegrebet i almindelighed er et relationsbegreb, hvorfor der så vidt ses, ikke er noget til hinder for en forskellig begrebsanvendelse på tværs af juridiske discipliner.

For denne kontekst er det centralt at afdække, hvornår en aktionærposition i henhold til ABL opstår henholdsvis ophører, herunder ved afståelse. Spørgsmålene hænger naturligvis sammen, idet opgivelsen af aktionærpositionen for den ene part rent logisk må medføre etableringen af en tilsvarende aktionærposition for en anden part. Om afståelsesbegrebet i ABL kan det vel generelt siges, at en aktionærposition ophører samtidig med ejerskabet [Note 76].

I TfS 1998, 397 H*Kurt Hall Jørgensen*, var sagens problem, på hvilket tidspunkt en afståelse af aktier skulle anses for at have fundet sted i relation til den dagældende aktieavancebeskatningslovs tre-års frist for fradrag af tab ved afståelse af aktier [Note 77]. Skattemyndighederne havde gennem en årrække opretholdt en praksis, hvorefter tab på aktier skulle fratrækkes i det indkomstår, hvor det med fornøden sikkerhed kunne sandsynliggøres, at selskabets kapital var tabt. I den konkrete sag fandt skattemyndighederne, at kapitalen var tabt før det tidspunkt, hvor skatteyderen havde været ejer af aktierne i 3 år. På linie med landsrettens mindretal bemærkede Højesteret, at den af skatteministeriets hævdede fortolkning af aktieavancebeskatningslovens § 1, stk. 2, hverken havde hjemmel i lovens § 1, stk. 2, eller i andre bestemmelser i loven eller lovens forarbejder. Videre fandt Højesteret, at den af skattemyndighederne fremførte fortolkning var i strid med grundprincippet i SL § 5 a. Endelig anførte Højesteret, at det forhold, at aktierne som følge af selskabets endelige opløsning ikke

længere eksisterer, nødvendigvis anses for omfattet af begrebet afståelse. ABL § 1, stk. 2, måtte herefter efter Højesterets vurdering forstås således, at *afståelsestidspunktet er tidspunktet for ejendomsrettens ophør* ved overdragelse eller på anden måde, herunder ved selskabets endelige opløsning [Note 78] . Højesteret bemærkede herefter, at skattemyndighederne ikke havde haft hjemmel til at nægte Kurt Hall Jørgensen - der indtil selskabets endelige opløsning fortsat var ejer af aktierne - det omtvistede tabsfradrag. TfS 1998, 397 H er efter min vurdering udtryk for rendyrket lovfortolkning på skatterettens område [Note 79] . Resultatet indebærer en civilretskonform fortolkning, idet Højesteret lægger vægt på ejendomsrettens ophør som udslagsgivende ved den skatteretlige vurdering. Et sådant udfald er baseret på den omstændighed, at det civilretlige ejendomsretsbegreb er lagt til grund ved vedtagelsen af aktieavancebeskatningsloven [Note 80] . Højesteret lagde sig med dommen tæt op ad en ordlydsfortolkning af skattelovgivningen, hvilket resulterer i en civilretskonform retstilstand, idet det civilretlige afståelsesbegreb ej heller omfatter den omhandlede situation [Note 81] . Hele sagsforløbet synes at være et eksempel på, at skatteretten forsøger at løsrive sig fra civilretten.

I det følgende undersøges skatteretlig rets- og administrativ praksis med henblik på at vurdere, om udgangspunktet fraviges.

### Bibeholdelse af væsentlige beføjelser

En aktionær kan efter omstændighederne have *bibeholdt så vidtgående beføjelser i forbindelse med en overdragelse*, at der ikke anes for at være etableret en ny aktionærposition. En overdragelse må som hovedregel medføre, at overdrageren uigenkaldeligt har fraskrevet sig rådigheden over aktierne.

Forbeholder sælger sig *retten til udbytte* på de overdragne aktier, herunder ret til fremtidige friaktier, udelukker dette ikke, at afhændelse har fundet sted. Begrundelsen er formentlig, at en udbyttebegrænsning ikke medfører nogen begrænsning i rådighedsadgangen over aktierne.

Af større betydning er derimod et *stemmeforbehold* , der fratager køberen den reelle indflydelse og rådighed over aktien.

Dette forhold belyses i TfS 1989, 110 Ø *Hans Ludvigsen* [Note 82] . Sagen omhandlede en skatteyder, der inden ABL's ikrafttræden i 1981 ejede aktiemajoriteten i et selskab. Da ABL blev indført, medførte dette, at tab fremover kun kunne modregnes i anden tilsvarende gevinst (reglen er senere ændret). For ikke at miste muligheden for tabsfradrag overdrog skatteyderen først en del af sine aktier til sine mindreårige børn og siden den resterende del af aktierne til sin bror. Begge overdragelser fandt sted til en meget lav kurs. I forbindelse med overdragelsen forbeholdt skatteyderen sig uden tidsbegrænsning den fulde stemmeret over de overdragne aktier. Da endvidere aktierne ifølge selskabets vedtægter ikke kunne omsættes frit uden godkendelse fra den samlede bestyrelse, hvortil skatteyderen i kraft af sin stemmeret reelt havde hele indflydelsen, fandt landsretten, at overdragelsen var betinget på en sådan måde, at den ikke kunne tillægges skatteretlig betydning som en afhændelse. Landsrettens væsentligste begrundelse var således det tidsubegrænsede stemmeretsforbehold. Implicit anerkendes dog tidsbegrænsede stemmeretsforbehold. Der blev endvidere lagt vægt på skatteyderens reelle mulighed for at nedlægge veto mod alle fremkomne forslag i selskabets bestyrelse, idet en sådan ret ikke fandtes for de øvrige bestyrelsesmedlemmer.

Trods landsrettens noget kategoriske afvisning af, at der forelå en afståelse, kan det dog ikke heraf udledes, at ethvert tidsubegrænset stemmeretsforbehold automatisk vil medføre, at overdragelsen ikke anerkendes i skatteretlig henseende [Note 83] .

Sælger havde også bibeholdt væsentlige beføjelser i TfS 1996, 66 Ø*Flemming Johansen*. I sagen blev der nægtet fradrag for skatteyderens aftægtsydelser til dennes fader. Baggrunden var, at sønnen havde erhvervet faderens aktier i to selskaber, og købesummen berigtigedes som en løbende ydelse. Til sikkerhed for

købesummen blev aktieposten inklusive stemmeretten håndpantsat hos faderen. Fradraget blev nægtet med henvisning til, at der ikke forelå en modydelse og dermed, at der ikke forelå en gensidigt bebyrdende aftale, idet der ikke forelå en reel overdragelse af de omhandlede aktier. Landsskatteretten fandt fradragsbegrænsningen berettiget, idet retten ikke fandt, at der var tale om en reel afhændelse. Der blev herved henset til, at såvel aktierne som stemmeretten hertil ville forblive hos faderen indtil dennes død. Østre landsret fastholdt resultatet, men begrundede dette med, at faderen havde bibeholdt så vidtgående beføjelser, at aftalen ikke kunne anses for at være en gensidigt bebyrdende aftale. Det afgørende i denne sag blev således en håndpantsætning kombineret med en stemmeretsoverdragelse.

Det må også civilretligt antages, at en kombination af disse forhold i visse tilfælde kan medføre, at der ikke anses at foreligge en afståelse. Af denne årsag kan det ikke uden videre lægges til grund, at TfS 1996, 66 Ø er udtryk for en skatteretlig fravigelse fra civilretten.

Der kunne endvidere stilles det spørgsmål, om hidtidigt eksisterende aktionærpositioner i retspraksis tillige er blevet opretholdt trods det forhold, at der var sket en overdragelse til en interesseforbunden part. Spørgsmålet er nærliggende for retspraksis vedrørende *koncerninterne aktietab* [Note 84]. Det må herom anføres, at det i disse sager ikke er aktionærpositionen der opretholdes, men derimod at konstatering af et reelt tab er en forudsætning for tabsfradragsretten, idet koncernen som helhed fortsat råder over de samme værdier [Note 85]. Der er således efter min vurdering ikke megen vejledning af hente i denne praksis vedrørende det skatteretlige aktionærbegreb.

Praksis om *salg og genkøb* af aktier i interessefællesskaber har dog fokuseret på, hvorvidt der foreligger et reelt salg eller ej [Note 86]. Heraf kan udledes, at det er afgørende for bedømmelsen, at der foreligger en reel mulighed i ændringer i aktiekursen i perioden fra salg til genkøb [Note 87]. Det er dog en forudsætning herfor, at der i civilretlig henseende foreligger en overdragelse. Implicit kan det således konstateres, at der i skatteretlig henseende ikke foreligger ophør af en aktionærposition, hvis der sker overdragelse for en kortere periode med begrænset risiko for ændringer i børskursen. Hermed opstår ej heller en ny aktionærposition for modparten under de tilsvarende omstændigheder. Bedømmelsen af disse forhold må være konkret.

### Påtagelse af vidtgående indkrænkninger i ejerbeføjelserne eller ændringer heraf

Det kan også forekomme, at en aktionær *påtager sig så vidtgående indskrænkninger i eller aftaler ændringer af ejerbeføjelserne*, at dette efter omstændighederne kan medføre, at aktien anses for afstået.

Det ledende præjudikat i denne forbindelse er TfS 1999, 214 H*Allan Andersen*, der netop omhandler afståelsesbegrebet i aktieavancebeskatningsloven. I sagen havde en aktionær udstedt en køberet på sine aktier i et selskab, idet han samtidig havde solgt en del af aktierne og optaget et lån hos køber. De resterende aktier i selskabet blev håndpantsat hos kreditor (køber). Det fremgik af pantehæftelsen, at panthaver havde stemmeretten over de pantsatte aktier. Endvidere var der særskilt aftalt, at kreditor kunne udnytte stemmeretten til at stemme for en fusion med kreditorselskabet. Endelig var tegningsretten i tilfælde af kapitalforhøjelse tildelt kreditor. Udbytte af aktierne tilkom debitor. Der blev indgået en aktionæroverenskomst, der begrænsede den årlige udbytteudlodning, på de aktier hvor køberselskabet havde køberet til, hvad der svarede til lånets forrentning.

Sagen er interessant, idet skattemyndighederne gjorde gældende, at de økonomiske realiteter var, at aktionæren ved køberetten havde fralagt sig den fulde ejerbeføjelse over aktierne. Told- og skattestyrelsen gjorde gældende, at der ikke nødvendigvis er parallelitet i den civilretlige og den skatteretlige bedømmelse. Styrelsen henviste endvidere til, at det er usædvanligt, at stemmeretten afgives ved pantsætning [Note 88]. Ejerbeføjelsens overgang ved pantsætningen illustreres efter skattemyndigheders opfattelse ved, at restkøbesummen for aktierne betaltes straks gennem det optagne lån. Arrangementet var ubestrideligt til dels

gennemført af skattemæssige årsager, idet aftalen skulle sikre, at aktierne kunne sælges skattefrit efter 7 års ejertid.

Under proceduren blev det anført, at afståelse var sket, idet skatteyderen reelt var stillet, som om han havde afhændet hele sin aktiepost. Således modtog han reelt betaling for aktierne gennem låneoptagelsen samtidig med at han - bortset fra udbytteretten - afgav sine ejerbeføjelser gennem afgivelse af stemmeretten og tegningsretten. Da der samtidig som følge af udbytteaftalen ikke var tale om nogen likviditetsbelastning for skatteyderen, medførte en samlet bedømmelse, efter skattemyndighedernes opfattelse, at der ikke var nogen reel risiko og, at begge parter reelt blev stillet, som om der var sket en overdragelse af aktierne, hvorfor arrangementet, uanset de civilretlige forhold, måtte tilsidesættes i skattemæssig henseende.

Højesterets flertal (3) fandt, at det var usandsynligt, at køberetten ikke ville blive udnyttet, hvorfor der i skattemæssig henseende forelå en afståelse af aktierne i medfør af <u>ABL § 2, stk. 1</u> [Note 89]. Højesterets mindretal (2) fandt imidlertid, at der på aftaletidspunktet var en*sådan usikkerhed om det videre kontraktsforløb*, at der ikke fandtes grundlag for at anse ejendomsretten til aktieposten for afstået på tidspunktet for køberettens meddelelse og gældsaftalens indgåelse [Note 90].

Det er ikke muligt af Højesterets præmisser at se, hvilken vægt opgivelsen af aktionærbeføjelserne blev tillagt, idet resultatet er baseret på en helhedsbedømmelse af handlen. Overdragelsen af stemmeret og tegningsrettighederne indgik imidlertid i Vestre landsrets samlede bedømmelse. Hvad der just er anført om Højesterets præmisser, må også siges om Vestre landsrets præmisser, idet der også her var tale om en helhedsbedømmelse, hvor også andre momenter inddrages. Det skal dog bemærkes, at en stemmeretsoverdragelse kombineret med en pantsætning også civilretligt kan medføre, at erhververen konkret anses for tildelt så vidtgående beføjelser, at forholdet i realiteten må sidestilles med en aktieoverdragelse, jf. forudsætningen i <u>UfR 1960, 304</u> H [Note 91]. Som det ses, kan det således også i civilretlig henseende forekomme, at en overdragelse af ejerbeføjelser medfører, at der faktisk er sket en overdragelse af ejendomsretten. Udfaldet af en tvist om aftalens civilretlige konsekvenser kan ikke forudsiges, men der synes tillige at være risiko for en civilretlig tilsidesættelse. Det er derfor ikke givet, at dommen er udtryk for en skatteretlig fravigelse fra civilretten, og dommen undsiger dermed ikke per se synspunktet om, at ABL også i praksis baseres på et civilretligt ejendomsretskriterium [Note 92]. Det må dog holdes for øje, at der med formuleringen "stillet som om aktierne da blev solgt", er nærliggende at antage, at Højesteret ikke har ment, at der også i civilretlig henseende har været tale om et salg allerede på det oprindelige aftaletidspunkt [Note 93].

Som udgangspunkt fokuserer skattemyndighederne på den civilretlige aftale og anerkender, at afståelse af aktier og andre aktiver først sker, når der foreligger en endelig accepteret aftale herom. Dette vil typisk sige på det tidspunkt, hvor købe- eller salgsretten udnyttes. Aftaleretligt er der indtil denne accept tale om et tilbud. Selve udstedelsen af en købe- eller salgsret medfører som udgangspunkt ingen skattemæssige konsekvenser.

Indgåelsen af modgående købe- og salgsretter kan indebære en betydelig indskrænkning i aktionærbeføjelserne eller stille parterne som om handlen allerede er gennemført på tidspunktet for indgåelsen af købe- og salgsretsaftalen.

En direkte stillingtagen til problemstillingen vedrørende indgåelsen af modgående købe- og salgsretter er nu fremkommet ved Højesterets dom af 11.11. 2005, jf. <u>TfS 2005, 933</u>*Newpond ApS*. Sagen drejede sig om afståelsestidspunktet for en aktiepost, hvortil der i maj 1999 blev indgået en køberet. I sagen havde selskabet afstået aktier i et andet selskab. Ved købet af ca. 75% af kapitalen opnåede køber en køberet til de resterende aktier for ca. 92 mio. kr. Køberetten kunne gøres gældende fra 1.8. 2001 og bortfaldt, hvis den ikke var gjort gældende senest 30.4. 2002. Såfremt køber ikke udnyttede køberetten, havde selskabet (og de øvrige aktionærer) en ret til at sælge aktieposten for ca. 121 mio. kr. Landsskatteretten fandt, at der forelå afståelse af aktierne ved køberettens udstedelse ud fra en omgåelsesbetragtning af 3-års reglen i ABL. Således som

Til anvendelse i henhold til Karnov Groups <u>Licensvilkår</u>

aftalekomplekset var udformet fandt Østre Landsret og Højesteret, at det i maj 1999 måtte have *stået som usandsynligt for parterne*, at køberetten til aktierne ikke som forudsat ville blive udnyttet af køber. Der blev herved lagt vægt på, at køberetten var kombineret med en salgsret samt på den meget betydelige prisforskel på de to rettigheder. Der blev endvidere lagt vægt på, at selskabet var afskåret fra at disponere over aktierne i strid med køberetten, idet en overdragelse blandt andet krævede bestyrelsens samtykke. Det blev ikke tillagt betydning, at stemmeretten og udbytteretten til aktierne ikke blev overdraget til køber, idet køber ejede 75% af kapitalen. Såvel Østre Landsret som Højesteret fandt derfor, at aktierne i skattemæssig henseende måtte anses for afstået på tidspunktet for aftalens indgåelse i maj 1999. Da aktierne havde været ejet i mindre end 3 år, var avancen skattepligtig.

Dommen må ses som udslag af en konkret vurdering, hvorved det bedømmes, om det efter en bevisvurdering må stå parterne klart, at der vil ske en overdragelse og, at der dermed ikke er en sådan grad af usikkerhed om, hvorvidt en afståelse vil ske.

*Pantsætning af aktier med tilhørende stemmeret og faktisk udnyttelse heraf i kombination med salgsfuldmagt* har i praksis ikke indebåret en afståelse af aktierne [Note 94].

### Aktielåneordninger

Ophør af en bestående aktionærposition er tillige nærliggende ved såkaldte *aktielåneordninger* [Note 95]. Dansk skatteretspraksis på dette område kan vel sammenfattes sådan, at udlånet ikke udgør en afståelse af aktierne for långiver [Note 96]. Dette gælder dog kun, såfremt låntager ikke misligholder låneaftalen, hvorved långiver må foretage dækningskøb, idet der i disse situationer vil være tale om afståelse på udlånstidspunktet. Samtidig er det fastslået, at låntagers eventuelle gevinster og tab i låneperioden skal beskattes i henhold til SL § 4 [Note 97]. På dette område synes praksis således nu logisk konsistent, og formentlig erhvervspolitisk begrundet [Note 98]. Det synes dog ud fra en teoretisk synsvinkel tvivlsomt at anerkende, at en de facto opgivelse af en aktionærposition ikke behandles som sådan. Det afgørende synspunkt bag praksis har tilsyneladende været, at der er tale om lån til eje. Lån til eje kendetegnes ved, at der sker en overførsel af ejendomsretten, således at modtageren skal tilbagelevere en ydelse af samme art og beskaffenhed som den modtagne. Synspunktet er formentlig, at aktier, ligesom penge kan være af så generisk karakter, at långiver må være indifferent over for, hvilke aktier der tilbageleveres [Note 99]. Det ses af oplysningerne i aktielånesagerne, *at* samtlige aktionærbeføjelser overgår til låntagere, *at* ejendomsretten anses for overgået til låntager, og *at* tilbageleveringen ikke skal ske med den samme aktie. Det er da også svært at forestille sig, at låntagers kreditor ikke skulle kunne støtte ret på, at ejendomsretten ligger hos låntager.

### Vedtægtsændringer

Ophør af bestående aktionærpositioner gennem afståelse har i dansk ret haft ganske stor bevågenhed i forbindelse med *vedtægtsændringer i selskaber*. Spørgsmålet, der indtil til videre alene har været til prøvelse i administrativ praksis, har nærmere været, om ændringer i bestående vedtægter kan medføre, at aktierne anses for at være afstået [Note 100]. Det klare udgangspunkt må være, at vedtægtsændringer ikke medfører afståelse af aktier. Efter en konkret vurdering antages det dog til tider, at aktien qua vedtægtsændringen har ændret identitet, hvorfor dette må sidestilles med en afståelse af den oprindelige aktie. Efter praksis er dette dog kun tilfældet, når vedtægtsændringen medfører en formueforskydning mellem selskabets aktionærer. Den konkrete vurdering støtter sig op ad en række momenter [Note 101]. Praksis vedrørende ændringer i stemmerettigheder kan sammenfattes således, at sådanne kun undtagelsesvis fører til, at der anses at foreligge afståelse [Note 102]. Derimod medfører vedtægtsændringer, der går ud på at ændre aktiernes udbytteret, at aktierne som udgangspunkt anses for afståede [Note 103]. Er formålet, at en del af aktiekapitalen fastfryses på det hidtidige kursniveau indebærer dette ligeledes en afståelse [Note 104].

Til anvendelse i henhold til Karnov Groups Licensvilkår

Spørgsmålet er, om domstolene ved en eventuel pådømmelse af spørgsmålet vil anlægge en ordlydsfortolkning af ABL § 1, stk. 2 eller foretage en samlet bedømmelse af dispositionerne. Særligt under hensyntagen til TfS 1998, 397 H *Kurt Hall Jørgensen* synes det rimeligt at antage, at den skitserede administrative praksis går længere end ABL § 1, stk. 2 umiddelbart indeholder hjemmel til [Note 105].

Det for konteksten relevante, er imidlertid blot, at en aktionærposition kan anses for at være ophørt, hvis der sker en formueforskydning mellem de eksisterende aktionærer gennem en ændring af de til aktien knyttede økonomiske rettigheder. Modsat dette har ændringer i de forvaltningsmæssige beføjelser ikke en tilsvarende skatteretlig virkning.

### Opretholdelse af aktionærforholdet i øvrigt

I visse situationer må *formelt bestående aktionærforhold opretholdes*, selvom der er sket en massiv overdragelse af aktionærbeføjelser. Dette gælder særligt, hvis der ikke er anledning til at underkende aktionærpositionens eksistens efter en konkret realitetsbedømmelse.

I SKM 2003, 184 LR, påberåbte skatteyderen sig en realitetsbetragtning vedrørende ejerskab til aktier. Sagens faktum var, at A A/S sammen med to andre selskaber B og C ejede det udenlandske selskab D. A A/S ønskede at overdrage sin aktiebesiddelse til C. Der var indgået en gensidig købe- og salgsret. Således havde C en køberet (call option) på aktierne, mens A A/S havde en salgsret (put option) på aktierne. Aftalen herom løb imidlertid først fra 2.1. 2003, og forespørgslen fandt sted i 2001. A A/S ønskede straks at afhænde sin aktiebesiddelse, men C ønskede at vente indtil ikrafttrædelsen af den gensidige købe- og salgsret. Man valgte derfor den strategi, at A A/S og B overdrog deres aktieposter til et SPV (Special Purpose Vehicle), som var oprettet og ejet af uafhængige parter, mens A A/S og B dog ville stille garanti for selskabets betydelige fremmedkapital. Samtidig hermed skulle aktionæroverenskomsten, hvori nævnte købe- og salgsretter var aftalt, ændres således, at SPV nu indgik som aktionær. Samtidig påtænktes det, at C skulle have en køberet mod SPV til at købe samtlige aktier i D. Samtidig skulle SPV pantsætte samtlige aktier i D til C, når købe- eller salgsretten udløstes. Tillige skulle aktionæroverenskomsten ændres sådan, at C ville blive tillagt kontrol over bestyrelse og direktion. SPV var i alt væsentligt afskåret fra at sælge og pantsætte aktierne. Ved køb af 1% yderligere af aktiekapitalen i D ville C kunne opnå fuld rådighed over generalforsamlingerne i D. Den daglige ledelse ville tillige tilkomme C's repræsentanter. Det var planlagt, at SPV i januar 2003 skulle overdrage sine aktier i D til C.

Som nævnt påstod A A/S, at der i realiteten var sket et direkte aktiesalg til C, og at hele salgssummen følgelig skulle anses som betaling for aktier og ikke som betaling for en salgsret, jf. KGL § 29. Det blev således anført, at det var parternes fælles hensigt, at C allerede ved overdragelsen til SPV ville opnå en ejers retsstilling og, at SPV ikke ville kunne udnytte nogen ejerbeføjelser i mellemperioden. Med andre ord var spørgsmålet, om man som skatteyder så at sige kan fremdiskontere et aktieejerskab uden iagttagelse af civilretlige formalia

Told- og Skattestyrelsen og Ligningsrådet fastslog imidlertid, at ejendomsretten ved overdragelsen ville overgå fra A A/S til SPV og ikke fra A A/S til C. Det forhold, at SPV's ejerbeføjelser i henhold til aftalegrundlaget mellem C og SPV i vidt omfang skulle indskrænkes, og at der var parterne hensigt, at SPV skulle overdrage aktierne til C, kunne ikke føre til, at SPV i skatteretlig henseende skulle anses for at have opgivet sin ejendomsret til aktierne. Ligningsrådet fastholdt derfor ejerskabet til aktierne hos den formelle erhverver heraf. Derfor fandtes der konkret at være tale om dels en aktieoverdragelse, dels en overdragelse af en salgsret.

Sagen viser således konkret, at aktionærstatus må bevares selv i situationer, hvor der sker en væsentlig overdragelse af aktionærbeføjelser. Det skal således ganske meget til for at ændre det formelle ejerskab [Note 106]. I modsætning til ovenstående praksis, hvorefter en frasigelse af vidtgående aktionærbeføjelser kan medføre afståelse, foreligger der i denne sag inddragelse af en tredje part. Det var således ikke et spørgsmål om konstatering af aktionærforholdet hos handelens parter, men derimod om man kan overføre aktieejerskabet til en tredje part efter en realitetsbedømmelse.

## 4.2. Aktionærforholdet som forudsætning for udbytteudlodninger

### Generelt

Udbyttebegrebet i LL § 16 A, stk. 1 fastlægger, at der ved udbytte forstås alt, hvad der af selskabet udloddes til aktionærer eller andelshavere. Tilsvarende gælder i SL § 4 e. LL § 16 B om tilbagesalg af aktier til det udstedende selskab, angiver direkte, at reglen sigter mod aktionærers tilbagesalg ved afståelse. Også KSL § 2, stk. 1, litra f (om begrænset skattepligt af udbyttebetalinger) forudsætter, at den fysiske person der modtager udbytte eller afståelsessummer ved tilbagesalg til udstedende selskab er en aktionær. Det tilsvarende er tilfældet for selskaber, jf. reglen i SEL § 2, stk. 1, litra c. Særligt interessant for selskaber er også den koncernskattefrihedsregel, der findes i samme bestemmelses 2. pkt. Tilsvarende fremgår det af SEL § 13, stk. 1, nr. 2, at ejerskabet til aktiekapitalen er en forudsætning for skattefritagelse hos danske moderselskaber af udbytter fra danske og udenlandske datterselskaber.

Udgangspunktet må også på dette område være, at der er overensstemmelse mellem det skatteretlige og det civilretlige aktionærbegreb. Alene en aktionær i civilretlig forstand vil derfor kunne behandles efter de nævnte udbytteforskrifter.

Aktionærbegrebet har betydning i to henseender. Dels bevirker begrebet, at den betaling en aktieejer modtager som udlodning fra selskabet, nødvendigvis må klassificeres som udbytte. Dels kan udelukkende aktionærer modtage udbytte fra selskabet [Note 107]. Aktionærforholdet er således en forudsætning for udbytteudlodningen [Note 108]. I praksis ses sammenhængen at have betydning i en række tilfælde.

### Forbeholdt udbytteret

Aktionærbegrebet aktualiseres ved betingede afhændelser, hvor aktier er overdraget, mens retten til udbytte er forbeholdt overdrageren eller tredjemand. Man taler herved om forbeholdt udbytte [Note 109]. I hidtidig praksis har førstkommende udbytteudlodning efter en overdragelse været anerkendt som udbytte for modtageren, som herved må antages at blive opfattet som aktionær, trods ejerforholdets forudgående ophør [Note 110]. Dette var eksempelvis tilfældet i TfS 1992, 588 LSR [Note 111]. Praksis om forbeholdt udbytte må antages at være praktisk begrundet, idet det i en overdragelsessituation kan være praktisk, at parterne har mulighed for at træffe aftale om, at et udbytte, der udloddes i relativ nær tilknytning til overdragelsestidspunktet, skal tilfalde sælger med den konsekvens, at udbytte fortsat skattemæssigt behandles som udbytte. Hermed opretholdes en fiktion om, at sælger i relation til det forbeholdte udbytte skattemæssigt anses for aktionær [Note 112]. I TfS 2001, 712 LR, nægtede Ligningsrådet dog skattefrihed for udbytter fra et datter- til et moderselskab ved en udlodning, som skulle finde sted efter overdragelsen. Ud fra en ordlydsfortolkning af SEL § 13, stk. 1, nr. 2, er afgørelsen utvivlsomt korrekt [Note 113]. Den refererede praksis er siden tilsidesat med TfS 2003, 616 LSR [Note 114]. Sagen vedrørte til dels spørgsmålet om, hvorvidt et selskab, som modtog udbytte fra et udenlandsk selskab, var skattepligtig heraf som tilskud, jf. SL § 4. Udbytteudlodningen skete efter overdragelsen af datterselskabsaktierne til det ultimative moderselskab. Landsskatteretten fandt det vigtigt at undersøge, hvornår en endelig og bindende aftale om overdragelsen måtte antages at foreligge. Da en sådan fandtes at foreligge forud for udbyttebetalingstidspunktet, fandtes beløbet ikke at kunne udgøre udbytte, men måtte derimod antages at udgøre en del af selskabets vederlag for aktierne. Fra det tidspunkt, hvor en aktiepost skattemæssigt anses for afstået, kan sælger herefter ikke i relation til efterfølgende udbytteudlodninger anses for aktionær og dermed ikke skattemæssigt oppebære provenuet fra sådanne efterfølgende udlodninger som udbytte. En kvalifikation som udbytte må herefter forudsætte, at generalforsamlingen har truffet beslutning om udbytteudlodningen, inden der indgås aftale om overdragelse af aktierne.

### Hybride finansieringsinstrumenter

Om et afkast er udbytte, har tillige betydning i forbindelse med kvalifikationen af visse hybride finansieringsinstrumenter. Dette yderst relevante spørgsmål skal ikke omtales yderligere, idet emnet er

uafklaret og forudsætter en omfattende analyse.

## Adskillelse af økonomiske og forvaltningsmæssige rettigheder

Aktionærbegrebet får betydning, når der skal vurderes, om *økonomiske og forvaltningsmæssige rettigheder kan adskilles med skatteretlig virkning således, at indehaveren af økonomiske rettigheder kan anses som værende rette indkomstmodtager af udbytte.*

Dette spørgsmål har kun implicit været til prøvelse i dansk ret, jf. Ligningsrådets bindende forhåndsbesked af 24.10 2000, journalnr. 99/00-4339-218 og 219. Der blev her taget stilling til, hvorvidt der udløses CFC-beskatning som følge af en påtænkt europæisk koncern-ejerskabsstruktur, hvorefter de økonomiske beføjelser besiddes af to holdingselskaber, mens de forvaltningsmæssige rettigheder besiddes af en såkaldt stichting [Note 115]. Nærmere præciseret var forholdet, at betingelsen i SEL § 32 om lav beskatning ville være opfyldt, hvis holdingselskaberne ikke kunne anses som rette indkomstmodtager af udbytterne fra de underliggende driftsselskaber. Hvis dette ikke var tilfældet, ville holdingselskaberne efter dansk skatteret blive anset for at have modtaget skattefri udbytter fra Stichtingen, hvilke ikke ville være skattefri i henhold til dansk skatteret. Ligningsrådet udtalte, at Stichtingen måtte anses for at være den egentlige ejer af aktierne i de underliggende selskaber, men at de økonomiske rettigheder vedrørende disse aktier dog var videreoverdraget. Dette medførte blandt andet, at det modtagne udbytte straks skulle videreudloddes til indehaveren af de økonomiske rettigheder. I Holland og Luxemburg anses de modtagne udbyttebetalinger for direkte at være sket fra de underliggende selskaber, hvorfor skattefrihed kunne komme på tale. Ligningsrådet bemærkede imidlertid, at sådanne betalinger efter dansk skatteret ikke kan betragtes som udbytte, da det efter Rådets opfattelse gjaldt, at Stichtingen ikke kunne fraskrive sig sin status som aktionær ved at overdrage retten til at modtage udbytte til andre. Der blev herved henvist til ordlyden af LL § 16 A, stk. 1. På denne baggrund måtte Stichtingen anses som rette indkomstmodtager af udbytte fra de underliggende selskaber.

I hvert tilfælde, for så vidt angår økonomiske rettigheder, er afgørelsen klar. Der kan ikke med skatteretlig virkning foretages en adskillelse af økonomiske og forvaltningsmæssige rettigheder til en aktie [Note 116]. Baggrunden for dette resultat kan tiltrædes. Forholdet er jo netop, at skatterettens udbytteregler forudsætter, at udbytte udbetales til en aktionær. Idet indehaveren af de økonomiske rettigheder ikke er aktionær, dvs. ejer af aktierne, kan udbetalingerne til denne indehaver ikke behandles som udbyttebetalinger til en aktionær.

## Aktielåneordninger

Udbytte fra *udlånte aktier i aktielåneordninger* beskattes som udbytte hos låntager og som almindelig indkomst hos långiver, hvis der sker refusion af beløbet til denne [Note 117]. Heri synes dog at ligge en mærkværdig konstruktion. Det antages, at långivers aktionærposition ikke ophører ved aktielån, jf. ovenfor. Samtidig antages det, at der ikke tilsvarende skabes en aktionærposition for låntager i forhold til eventuel aktieavancebeskatning hos denne. Samtidig antages det, at der faktisk skabes en aktionærposition hos låntager i forhold til udbyttebetalinger. Om dette forhold anføres i LV 2005 S.G.2.3.3., at udbyttebeskatning følger den civilretlige ejer af aktien. Udsagnet kan tiltrædes. Det er dog ikke rigtigt, når det samme sted i tilslutning hertil anføres, at udbyttebetalinger fra selskabet beskattes hos den person, der civilretligt er berettiget til at modtage udbytte fra selskabet. Som påvist ovenfor, er der ikke nødvendigvis sammenfald mellem ejeren af en aktie, og den der er berettiget til at modtage udbytte.

Uanset hvilket hjemmelsgrundlag, der påberåbes til støtte for dette resultat, synes der at være hjemmelsmæssige problemer forbundet med udfaldet. Udbytte i henhold til LL § 16 A, forudsætter tilstedeværelsen af en aktionærposition. Tilsvarende gælder i forhold til SL § 4 e. Der er således ikke tale om udbytte, med mindre udbetalingen sker til en aktionær. Da dette ikke er tilfældet, idet det jo fremgår, at långiver fortsat skal anses som aktionær, er praksis vanskelig at begrunde. Det synes rimeligt at forudsætte, at en aktionær i henseende til ABL tillige er aktionær i henseende til LL § 16 A og SL § 4 e. Endda er det rimeligt at

forudsætte, at aktionærbegrebet i disse henseender følger den civilretlige begrebsfastslæggelse. Den omtalte praksis vedrørende aktielåneordninger kan ikke bidrage nævneværdigt til den generelle afdækning af aktionærbegrebet, idet der har gjort sig særlige forhold gældende vedrørende lån til eje af generiske aktiver, ligesom der i udbyttesituationen foretages en afvigelse fra civilretten.

## Beneficial ownership og dividend stripping

Det er en nærliggende tanke, at der i begrebet " *beneficial owner* " kan hentes inspiration til afgrænsningen af et generelt skatteretligt aktionærbegreb. Begrebet indgår i dobbeltbeskatningsoverenskomsternes udbytte-, rente-, og royaltybestemmelser, typisk art. 10, 11 og 12, jf. OECD MDBO. I henhold til OECD MDBO art. 10, stk. 2, er det en forudsætning for skattenedsættelsen, at "beneficial owner" (på dansk den "retmæssige ejer") er hjemmehørende modtagerstaten [Note 118] . Den retmæssige ejer til udbytte må antages ofte at være aktionæren i et selskab [Note 119] . I henhold til OECD modellen og flertallet af dobbeltbeskatningsoverenskomster er det dog ikke et krav, at modtageren ud over at være retmæssig ejer af udbytte tillige skal være retmæssig ejer af de underliggende aktier [Note 120] .

OECD's kommentarer indeholder ikke fyldestgørende forklaring af begrebet, idet det i pkt. 12 til art. 10, alene fremgår, at udtrykket ikke er anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forbindre skatteunddragelse og skatteundgåelse [Note 121] . Således foreligger dobbeltbeskatning ikke, hvis indkomstmodtageren ikke er ejer af indkomsten i skattemæssig henseende. Som eksempler nævnes, at en agent eller en nominee ikke er beneficial owner. Tilsvarende anføres om gennemstrømningsenheder ("conduit"). Der lægges herved op til en realitetsbetragtning, hvorefter et gennemstrømningsselskab normalt ikke kan anses for at være beneficial owner, selv dette er den formelle ejer, hvis dette reelt har meget snævre beføjelser, som i realiteten gør selskabet til en nullitet eller administrator, der handler på vegne af andre parter.

Man erfarer hurtigt, at begrebet er overtaget fra common law retstraditioner [Note 122] . Af denne årsag har begrebet kun en klar betydning i få lande (herunder UK og USA), mens mange andre lande ikke kan genkende begrebsdannelsen [Note 123] . Commom law retstraditionen opererer i sin ejendomsret typisk med en sondring mellem økonomiske og juridisk ejerskab. Det kan sættes lighedstegn mellem økonomisk ejerskab og beneficial ownership [Note 124] . Begreberne "nominee", "legal owner" og "beneficial owner" indgår ikke i dansk ejendomsretsterminologi, men er udtryk for det forhold, at ejendomsretsbegrebets forskellige funktioner i angelsaksisk ret typisk er fordelt på flere personer. I flere civil law lande (herunder Danmark om end tilhørende skandinavisk retstradition) anvendes ikke en tilsvarende tilgang, idet man i stedet overvejende fokuserer på juridisk ejerskab. Den retmæssige ejer vil herefter være den part, der har det juridiske ejerskab til udbyttet, med mindre ejerskabet ud fra en konkret realitetsbedømmelse må tilsættes som værende uden reelt indhold i skatteretlig henseende [Note 125] .

I mangel af en international skatteretlig betydning af begrebet "beneficial owner" kan der argumenteres for, at man i overensstemmelse med OECD MDBO art. 3, stk. 2, må henvise forståelsen til intern ret i kildestaten. For dansk rets vedkommende kunne man derved kraftigt nedtone betydningen af begrebet. Imidlertid er det blevet argumenteret for, at der trods ovenstående kan identificeres en international skatteretlig betydning af begrebet "beneficial owner" [Note 126] . Der argumenteres for, at betydningen i de common law lande, hvorfra definitionen har sin oprindelse, skal anvendes som udgangspunkt. I kort form sammenfattes analysen på dette punkt til følgende: "...*The beneficial owner is the person whose ownership attributes outweigh that of another person...*" [Note 127] . Ved denne bedømmelse skal realiteten tillægges betydning frem for alene formaliteten [Note 128] .

Det kan således ikke afvises, at begrebet beneficial owner kan opnå en vis betydning også i dansk ret [Note 129] . Anvendelse af begrebet synes med ovenstående in mente ikke at være i modstrid med hidtidig dansk intern skatteretspraksis. I mangel af retspraksis om spørgsmålet er det dog indtil videre begrænset hvilken værdi begrebet har i forbindelse med en generel afgrænsning af skatterettens aktionærbegreb.

I international skatteret ses aktionærbegrebet og begrebet beneficial owner at blive aktualiseret i forbindelse med såkaldt *dividend stripping* . Dividend stripping udgør ikke nogen eksakt juridisk begrebsdannelse, men kan løseligt siges at referere til sådanne dispositioner, hvor udbyttebeskatning søges undgået eller, hvor der søges opnået en gunstig udbyttebeskating, som der ellers ikke var adgang til for investor [Note 130] . Der kan konkret være tale om at ville konvertere kildeskattepligtige udbytter til andre betalinger, der ikke udløser kildeskat. Tilsvarende kan der være tale om, at udenlandske investorer ønsker at opnå adgang til interne lempelsesregler vedrørende økonomisk dobbeltbeskatning. Endvidere kan der også være tale om at ville opnå adgang til den gunstige skattemæssige behandling efter moder-/datterselskabsdirektivet eller en DBO [Note 131] . Det er karakteristisk for dividend stripping, at en udenlandsk person overlader sin ret til udbytte til en anden person, som enten fritages for udbyttekildeskat, er berettiget til en godtgørelse i anledning heraf efter nationale regler, eller er berettiget til en lavere beskatning i henhold til en DBO, mens det økonomiske ejerskab til de underliggende aktier bibeholdes. Incitamentet er til at få øje på for eksempelvis en aktionær hjemmehørende i en ikke-overenskomststat [Note 132] . Der foretages en simpel overførsel af de økonomiske rettigheder til en person eller et selskab, der er hjemmehørende i en overenskomststat, mens man modtager en betaling for udbytteretten [Note 133] .

I mangel af egentlige retskilder synes det vanskeligt at udtale sig i entydige vendinger om den skatteretlige behandling af dividend stripping arrangementer i dansk ret. Under henvisning til den omtalte bindende forhåndsbesked og det heraf udledte tankegods, må meget tale i retning af, at en indehaver af økonomiske rettigheder til aktier ikke kan opnå aktionærstatus i forhold til danske udbytteregler. Tilsvarende kan en egentlig aktionær ikke ved sådanne dispositioner fraskrive sig sin aktionærstatus. Tilsvarende gælder antageligvis vedrørende moder-/datterselskabsdirektivet [Note 134] . Dividend stripping synes derfor ikke umiddelbart anvendeligt som skatteplanlægningsinstrument efter intern dansk ret, trods den bestående selskabsretlige mulighed for at adskille ejerskabet til en aktie og de økonomiske rettigheder hertil [Note 135] .

### 4.3. Aktionærbegrebet og omstrukturering

Aktionærbegrebet har været genstand for en vis - om end beskeden - bevågenhed i forbindelse med de *skatteretlige omstruktureringsregler*. Reglerne om skatteneutrale aktieombytninger i ABL § 13, forudsætter, at det selskab, med hvilket der ombyttes aktier, bliver aktionær i det overtagne selskab. Således hedder det i ABL § 13, stk. 2, at selskabet"..erhverver en andel i et andet selskabs aktiekapital med den virkning, at det opnår flertallet af stemmerne i dette selskab...". I sammenhæng med den bagvedliggende direktivtekst synes det at fremgå, at der i denne forbindelse er tale om et ejendomsretkriterium, forstået som en erhvervelse af ejendomsretten til aktierne, der giver ejendomsret til de fornødne stemmerettigheder [Note 136] . *Michael Serup* finder dette entydigt og uden plads til fortolkningsusikkerhed. Det antages samtidig at gælde, at dette kriterium er*formelt*. Som følge heraf kan der ikke stilles nærmere krav til kvaliteten af aktieerhvervelsen, og der er følgelig ikke hjemmel til andet end at lade det rent civilretlige ejendomsretskriterium være afgørende. Af denne årsag må derfor hverken indskrænkninger i dispositionsmæssige, forvaltningsmæssige eller økonomiske beføjelser berøre adgangen til at gennemføre aktieombytninger med skatteretlig succession [Note 137] . Der kan dog argumenteres for, at betingelserne i ABL § 13, stk. 2 ikke er opfyldt, hvis stemmeretten reelt ikke kan udøves eksempelvis grundet bestemmelserne i en aktionæroverenskomst [Note 138] . Imidlertid kan andre begrænsninger i aktionærrettighederne, end sådanne der vedrører stemmeretten, ikke være afgørende for adgangen til at foretage aktieombytning, med mindre indskrænkningerne er så betydelige, at selve aktionærpositionen må anfægtes.

I praksis har problemstillingen særligt været, om en midlertidig aktionærposition (ejendomsret til aktierne) skal opretholdes, således at aktieombytning kan tillades [Note 139] .

Der blev kastet lys over aktionærbegrebet i ABL § 13, med dommen i TfS 2003, 355 Ø*Hans-Carl Bøgh-Sørensen* [Note 140] . Situationen var den, at en fysisk aktionær for at opfylde kravet i ABL § 13, om erhvervelse af

stemmeflertal købte en aktie på nominelt 1.000 kr. af medaktionæren i selskabet (MD-koncernen), hvorefter hovedaktionæren formelt rådede over 50,02% af stemmerne i selskabet. Der var aftalt visse indskrænkninger i stemmeretten på de sidst erhvervede aktier. Efter sagens oplysninger var der med transaktionen tale om en "salgsmodning" af de omtalte aktier, idet disse efterfølgende kunne afstås skattefrit. Mindre end tre uger efter dette køb af aktier og den efterfølgende aktieombytning solgte det nyopståede holdingselskab nu hele win aktiebesiddelse i det fællesejede selskab til moderselskabet i MD-koncernen. Østre landsret fandt det bevist, *at* der på aftaletidspunktet forelå en fælles indforståelse om tilbagesalg til MD-koncernen, *at* skatteyderen ikke havde reel ejerrådighed eller ejerrisiko vedrørende aktien. Begrundelsen herfor var, *at* det oprindelige aktiesalg efter landsrettens opfattelse var sket for at sikre den fysiske aktionærs tilslutning til en senere fusion af selskabet, *at* der var tale om et meget snævert tidsmæssigt forløb og, *at* der ikke var forhandling om salgskursen ved den endelige overdragelse af samtlige aktierne. Af disse årsager fandt Østre Landsret, at skatteyderen hverken reelt eller i skattemæssig henseende kunne anses for at være blevet ejer af aktien. Den omstændighed, at der med lov nr. 312 af 17.5. 1995 blev indført regler, der har til formål at hindre aktieombytninger efterfulgt af hurtige salg med henblik på at omgå eller udskyde aktieavancebeskatning, medførte efter landsrettens opfattelse ikke indskrænkninger i adgangen til ud fra en realitetsbedømmelse at tilsidesætte formelle overdragelser i skattemæssig henseende.

Selvom udgangspunktet på dette område tillige er, at der er kongruens mellem civilret og skatteret, kan dette udgangspunkt således fraviges efter en konkret realitetsbedømmelse [Note 141] . Man kan vel ikke med sikkerhed sige, at overdragelsen i den omtalte sag ville blive opretholdt i civilretlig henseende. Det skal netop holdes for øje, at anvendelsen af det civilretlige ejendomsretsbegreb også indebærer, at retten til aktieombytning ikke kan basere sig på en stemmeretsbesiddelse, der er løsrevet fra ejendomsretten til de underliggende aktier, herunder eksempelvis gennem en panterets- eller stemmeoverførselsaftale [Note 142] .

## 4.4. Øvrige situationer

I visse situationer anerkendes det, at der ses bort fra formelle ejerforhold. Dette var eksempelvis tilfældet i TfS 1997, 225 Ø (forlig), hvor der blev givet tilladelse til sambeskatning mellem et dansk holdingselskab og dettes engelske datterselskab. Engelsk ret anerkendte ikke enkeltmandsselskaber (plc.) som juridiske personer i hæftelsesmæssig henseende, hvorfor datterselskabets direktør tegnede en aktiepost på 1 GBP, ud af en samlet kapital på 1000 GBP. Direktøren fraskrev sig samtlige aktionærrettigheder. Landsretten udtalte i sin tilkendegivelse, at sambeskatningsbetingelserne i SEL § 31 måtte anses for at være opfyldt, idet direktørens aktiepost alene udgjorde et formelt ejerskab, og at holdingselskabet måtte anses som værende den reelle ejer heraf. Herefter tog skatteministeriet bekræftende til genmæle, jf. kommentaren i TfS 1997, 231 DEP.

## 5. Konklusion

Dette artikel har bibragt en indsigt i det civilretlige og det skatteretlige aktionærbegreb. Om det civilretlige aktionærbegreb er det konstateret, at dette ikke har haft den store bevågenhed, men at det har særlig betydning i forbindelse med spørgsmålet om opsplitning af aktionærbeføjelser og ejerskifter. Der findes ikke nogen egentlig civilretlig aktionærdefinition, men typisk kan aktionærpositioner beskrives ved hjælp af de eksisterende aktionærbeføjelser, herunder økonomiske, forvaltningsmæssige og dispositionsmæssige aktionærbeføjelser. Disse beføjelser ligger typisk hos aktionæren, men kan efter omstændighederne tilkomme andre. Fremstillingen har lagt til grund, at en aktionær er *den der har ejendomsretten til en eller flere aktier.* *Imidlertid forholder det sig sådan, at det ikke altid er ejeren af en aktie, der kan udnytte en aktionærbeføjelse.* Det er en vigtig erkendelse, at der ikke nødvendigvis er sammenfald mellem ejerskabet til en aktie og udøvelsen af en aktionærbeføjelse. Det afvises i denne forbindelse, at aktionærbegrebet af denne årsag antager karakteren af et funktionsbestemt begreb.

Det blev konkluderet, at aktionærbegrebet i skatteretlig henseende må fortolkes i overensstemmelse med civilrettens aktionærbegreb. Det klare udgangspunkt er herefter, at den formelle aktionærposition skal opretholdes også i skattemæssig henseende, med mindre særlige forhold gør sig gældende. Det samlede indtryk, der dannes er, at der i vidt udstrækning er overensstemmelse mellem skatte- og civilretten. Den overvejende del af de konstaterede fravigelser er enten usikre og/eller baseret på en konkret skatteretlig realitetsbedømmelse.

## Fodnoter

[1] Jf. eksempelvis konstateringen hos *Rasmus Kristian Feldthusen*: Trusts, 2002, s. 267.

[2] Jf. *Magnus Aarbakke* i TfR 1993, s. 59 ff.

[3] Jf. herom *Søren Friis Hansen & Jens Valdemar Krechel*: Lærebog i selskabsret II, 2000, s. 92.

[4] Tilsvarende benyttes begrebet "anpartshaver" i anpartsselskabsloven, tillige uden nærmere afklaring heraf. I det følgende omtales alene aktionærbegrebet, men udredningerne antages tillige at have gyldighed for anpartshaverbegrebet. I regnskabsmæssig henseende er aktionærforholdet en del af begrebet virksomhedsdeltager, jf. ÅRL bilag 1, A. 6. Udtrykket betyder medejer af virksomheden, uanset hvorledes den pågældendes forhold til virksomheden og til eventuelle andre medejere er struktureret. Den pågældende skal eje kapitalandele i virksomheden. Et sådant ejerskab indebærer principielt, at man har del i virksomhedens egenkapital. Det er ikke i regnskabsmæssig henseende tilstrækkeligt blot at besidde aktier til sikkerhed (pant). Panthavere eller personer, der som følge af særlig aftale er tildelt nogle, men ikke alle aktionærbeføjelser, f.eks. stemmeretten, hører principielt ikke under begrebet.

[5] Jf. herom *Hugo P. Matre* i NTS 2001. s. 395, hvor det i note 2 anføres, at forfatterens betragtninger trods ugangspunktet i norsk ret tillige har betydning for retstilstanden i de øvrige nordiske lande, herunder Danmark. Se tilsvarende *Magnus Aarbakke* i TfR 1993, s. 59 ff.

[6] Jf. *Bent Ramskov*: Intern selskabsomstrukturering, 2001, s. 75.

[7] Jf. *Hugo P. Martre* i NTS 2001, s. 400.

[8] Jf. *Magnus Aarbakke* i TfR 1993, s. 60.

[9] Se om sondringen mellem forvaltningsmæssige og økonomiske beføjelser; Betænkning nr. 540, 1969, s. 78, *Erik Werlauff & Jørgen Nørgaard*: Vedtægter og aktionæroverenskomster, 1995, s. 52 ff, *Bent Ramskov*: Intern selskabsomstrukturering, 2001, s. 76 ff, *Søren Friis Hansen & Jens Valdemar Krenchel*: Lærebog i selskabsret II, 2000, s. 96, og Magnus Aarbakke i TfR 1993, s. 60 ff. Se generelt om aktionærers rettigheder *Åse Koll Lunde* m.fl. i Revisjon og Regnskap 2003/5, s. 24 ff.

[10] Jf. *Erik Werlauff & Jørgen Nørgaard*: Vedtægter og aktionæroverenskomster, 1995, s. 52.

[11] Netop denne aktionærbeføjelse, og særligt herved selve aktionærbegrebet har været genstand for en norsk Høysteretts-dom, jf. Rt. 2000, s. 1792 (Montell-sagen) og det er netop denne dom der har foranlediget den konkrete interesse for problemstillingen hos *Hugo P. Matre* i NTS 2001. s. 395 ff. Sagen omhandlede i korthed spørgsmålet om hvorvidt en aktionær der havde fået sine aktier bortskrevet ved nedskrivning af aktiekapitalen, og som dermed principielt ikke længere er aktionær kan kræve granskning. Høysteretts flertal kom frem til, at granskning kunne kræves i en sådan situation. Baggrunden for dommens resultat findes i hensynet til minoritetsaktionærerne, idet domstolen fandt, at disse ud fra reale grunde måtte beskyttes. Teknisk set blev der herved foretaget en udvidende fortolkning af aktionærbegrebet, idet granskningsbestemmelsen i norsk ret direkte foreskriver, at kun aktionærer har denne ret. Se i detaljer om dommen Hugo P. Matre i NTS 2001, s. 396 ff, hvor det anføres, at udfaldet i sagen udelukkende havde betydning i forhold til granskningsinstituttet, og ligestillelsen med en aktionær ikke kunne udstrække til at omfatte andre aktionærbeføjelser i selskabet.

[12] Jf. *Erik Werlauff & Jørgen Nørgaard*: Vedtægter og aktionæroverenskomster, 1995, s. 53.

[13] Jf. *Erik Werlauff & Jørgen Nørgaard*: Vedtægter og aktionæroverenskomster, 1995, s. 54.

[14] Jf. *Magnus Aarbakke* i TfR 1993, s. 61 ff. Denne forfatter anser ejendomsretten som en økonomisk beføjelse.

[15] Jf. *Erik Werlauff & Jørgen Nørgaard*: Vedtægter og aktionæroverenskomster, 1995, s. 54.

Til anvendelse i henhold til Karnov Groups Licensvilkår

[16] Se hertil UfR 1968, 766 H, vedrørende stemmeretten.

[17] Jf. herom *Søren Friis Hansen & Jens Valdemar Krenchel*: Lærebog i selskabsret II, s. 96.

[18] Jf. *Søren Friis Hansen & Jens Valdemar Krenchel*: Lærebog i selskabsret II, 2000, s. 96.

[19] Jf. Hugo P. Matre i NTS 2001, s. 396.

[20] Jf. *Hugo P. Matre* op.cit., men modsat *Magnus Aarbakke* i TfR 1993, s. 59 ff (s. 61), der i stedet anser ejendomsretten til aktien som en af de økonomiske rettigheder som knytter sig til en aktie. På linie med førstnævnte forfatter findes det tilsvarende mere hensigtsmæssigt at anvende ejendomsret som samlebegreb for rådigheden over alle rettigheder og pligter knyttet til en aktie og som ikke er overført til andre eller begrænset på anden måde. Resultatet nås tillige ud fra en fortolkning af den til ASL § 27 svarende regel i norsk ASL. Det konstateres herom, at bestemmelsen trods sin formulering ikke giver anledning til en generel begrebsopfattelse i henseende til aktionærbegrebet, jf. *Hugo P. Martre* i NTS 2001, s. 402, der dog herved tilsyneladende vender sig mod udlægningen hos *Magnus Aarbakke* m.fl.: Aksjeloven og allmennakjseloven, 2000, s. 864. Forfatteren finder, at bestemmelsen på den ene side kan udlægges sådan, at de forvaltningsmæssige rettigheder er de afgørende ved afgørelsen af hvem der er aktionær. På den anden siden kan bestemmelsen udlægges sådan, at de økonomiske beføjelser er afgørende. Denne antagelse støttes på en inddragelse af praksis fra Norges Høysterett. I skattesager har domstolen således ved vurderingen af om ejendomsretten har nogen realitet for den passive aktionær, ikke lagt vægt på de forvaltningsmæssige rettigheder, men derimod lagt vægt på håndteringen af udbytte ved vurderingen af om ejerskabet har været pro forma, jf. Rt 1998, s. 1771, og hertil *Hugo P. Matre* i Revisjon og Regnskap 1999/5, s. 38. På denne baggrund slutter Matre, at Høysteretts brug af aktionærbegrebet rejser det spørgsmål, om placeringen af de forvaltningsmæssige beføjelser kan anses som et egnet kriterium ved en generel selskabsretlig begrebsfastlæggelse. Uanset dette finder forfatteren, op.cit, s. 403, at det følger af aksjelovens struktur, at begrebet ikke uden videre kan fastlægges på baggrund af en enkelt bestemmelse. Idet der ikke er tale om nogen legaldefinition må begrebet efter forfatterens opfattelse fastlægges konkret fra situation til situation. Synspunktet kan sammenfattes således, at det må vurderes konkret, hvem der har de enkelte rettigheder og pligter. Rettighedshaveren efter denne vurdering vil være aktionær i den aktuelle bestemmelses forstand, i det omfang begrebet benyttes heri. Alternativt kan personen blive ligestillet med en aktionær, uden selv at være aktionær.

[21] Jf. NTS 2001, s. 395 ff.

[22] Det kan således forekomme, at en aktionær er afskåret fra at udøve en eller flere af de rettigheder, som er knyttet til vedkommendes aktier. Dette gælder eksempelvis, hvis der er aftalt regler om stemmeloft i vedtægterne. Dette medfører imidlertid ikke, at ejeren i sådanne konkrete situationer må fratages aktionærbenævnelsen.

[23] Man kan hertil stille det spørgsmål, om en aktieerhverver der ikke er noteret i aktiebogen, jf. ASL § 27 og følgelig ikke kan udnytte de forvaltningsmæssige beføjelser, men dog kan udnytte de økonomiske beføjelser, ikke da må anses som en aktionær førend de forvaltningsmæssige rettigheder kan udøves. Jeg er principielt enig i, at der her klart må være tale om en aktionærposition forud for adgangen til at udnytte de forvaltningsmæssige rettigheder. Dette støtter efter min opfattelse blot ikke synspunktet om aktionærbegrebets relativitet. Derimod er der blot atter tale om det forhold, at betingelserne for at udnytte beføjelserne varierer.

[24] Norsk ret indeholdt tidligere et egentligt forbud mod splitning af rettigheder. Forbuddet gled ud af lovgivningen i 1976, jf. *Magnus Aarbakke* i TfR 1993, s. 64.

[25] Jf. *Hugo P. Martre* i NTS 2001, s. 400, og *Magnus Aarbakke* i TfR 1993, s. 59 ff (s. 63 ff). Eksempelvis kan stemmeret og andre rettigheder på generalforsamlingen udskilles, men dog kun i form af en fuldmagt som til enhver tid kan tilbagekaldes, jf. ASL § 66.

[26] Jf. *Bent Ramskov*: Intern selskabsomstrukturering, 2001, s. 108.

[27] Når et selskab har givet andre end aktionærer økonomiske beføjelser overfor selskabet, kan disse rettigheder som udgangspunkt overdrages efter almindelige regler om formuerettigheder.

[28] Jf. eksempelvis *Magnus Aarbakke* i TfR 1993, s. 59 ff.

[29] Jf. *Hugo P. Martre* i NTS 2001, s. 401.

[30] Jf. *Magnus Aarbakke* i TfR 1993, s. 65.

[31] Jf. *Magnus Aarbakke* i TfR 1993, s. 67.

[32] Jf. *Erik Werlauff*: Generalforsamling og beslutning, 1983, s. 369. Se om princippet i svensk ret *Jesper Prytz & Mart Tamm*: Tilskott utan aktieteckning, 1995, s. 156 ff.

[33] Jf. *Erik Werlauff*: Werlauff's kommenterede aktieselskabslov, 2002, s. 175, og UfR 1963, 111 H, samt forudsat ved UfR 1991, 133 H Louis Poulsen.

[34] En fuldmægtig skal ikke nødvendigvis benytte fuldmagten i aktionærens interesse, hvorfor en fuldmagt i praksis kan bruges som supplement til overdragelse af økonomiske rettigheder i selskabet.

[35] Jf. den detaljerede analyse hos *Erik Werlauff*: Generalforsamling og beslutning, 1983, s. 368 ff.

[36] Jf. *Magnus Aarbakke* i TfR 1993, s. 66.

[37] Se herom *Bernhard Gomard*: Obligationsret, 3. del, 1993, s. 138 f, og *Erik Werlauff*: Werlauff's kommenterede aktieselskabslov, 2002, s. 172.

[38] Se også VPHL § 71, hvorefter en værdipapircentral kan betale med frigørende virkning til den der er registreret som berettiget som modtager af betalingen.

[39] Jf. Betænkning nr. 1230, 1992, s. 88.

[40] Loc.cit.

[41] Jf. *Bernhard Gomard*: Aktieselskaber & anpartsselskaber, 2000, s. 159.

[42] Rådgivning i forbindelse med udbetaling af udbytter mv. til storaktionærer, jf. ASL § 28 a, burde som udgangspunkt ikke volde vanskeligheder. I praksis viser det sig imidlertid, at en sådan overholdelse af selskabslovgivningen ikke ukritisk kan forudsættes. Således ses det i vidt omfang, at eksempelvis udenlandske nominees med formelle "aktiebesiddelser", der overstiger 5%-grænsen står noteret i selskabernes aktiebog som aktionærer.

[43] Jf. *Bernhard Gomard*: Aktieselskaber & anpartsselskaber, 2000, s. 160.

[44] Jf. I. *A. Tokley*: Company Securities - Disclosure of Interests, 1995, s. 1 ff, og Betænkning nr. 1230, 1992, s. 87. Det forsøges i betænkningen at afgrænse en nominee overfor en stråmand. Ved en nominee forstås en person, der i eget navn indskriver aktier, der tilhører en anden person, uden herved (direkte) at skjule, at han ikke er ejer i juridisk forstand. En stråmand er karakteriseret ved, at stråmanden juridisk set fremstår som ejer over for omverdenen, men at der mellem stråmanden og den rette ejer er en hemmelig aftale om ejerskabet, op.cit.

[45] Jf. I. *A. Tokley*: Company Securities - Disclosure of Interests, 1995, s. 1.

[46] Jf. Betænkning nr. 1230, 1992, s. 89, og *Erik Werlauff*: Werlauff's kommenterede aktieselskabslov, 2002, s. 173. Hermed er anvendelsesområdet i dansk ret indskrænket i forhold til anvendelsen i andre lande, jf. herom I. *A. Tokley*: Company Securities - Disclosure of Interests, 1995, s. 1 ff.

[47] Jf. Betænkning nr. 1230, 1992, s. 90. I den omtalte betænkning erkendes det, at det i praksis ikke altid vil være muligt for selskabet at skelne en nominee fra den reelle ejer - i særdeleshed ikke, hvis nomineen i aktiebogen fremstår som ejer. Nomineen vil derfor, hvis selskabet ikke har kendskab til aftalen, blive betragtet som den rette ejer. På samme måde anføres det, at en stråmand vil fremstå som rette ejer og vil også af selskabet blive betragtet som den rette ejer.

[48] Ordningen blev senest vurderet i Betænkning nr. 1230, 1992, s. 87 ff (s. 92 ff). Udvalget fandt, at ordningen skulle besvares således, at notering i aktiebogen fortsat baseres på et frivillighedsprincip.

[49] Jf. Bekg. nr. 925 af 17.10. 1996.

[50] Der skal også ske registrering, hvis kontoen føres på vegne af flere ejere, hvilket er tilfældet ved såkaldte samledepoter, som føres af en værdipapirhandler, og som indeholder flere kunders værdipapirer, jf. VPHL § 6, stk. 3. Værdipapirhandleren skal i disse tilfælde føre et register, hvoraf de enkeltes ejerforhold til de registrerede værdipapirer klart fremgår.

[51] Jf. *Nis Jul Clausen*: Sikkerhed i fordringer, 2003, s. 124, og Bernhard Gomard: Aktieselskaber & anpartsselskaber, 2000, s. 159.

[52] Jf. Nis Jul Clausen: Sikkerhed i fordringer, 2003, s. 124, og Lars Hedegaard Kristensen: Studier i erhvervsfinansieringsret, 2003, s. 344, samt Bernhard Gomard: Aktieselskaber & anpartsselskaber, 2000, s. 160.

[53] Jf. Betænkning nr. 1230, 1992, s. 88.

[54] Tilsvarende gælder for aktionærer, der er bestyrelses- eller direktionsmedlem eller ledende medarbejder i et børsnoteret selskab, idet disse personers aktiebesiddelser skal noteres på vedkommende eget navn i selskabets aktiebog, jf. ASL § 53, stk. 2.

[55] ÅRL § 74 foreskriver tillige noteoplysning vedrørende storaktionærernes aktiebesiddelser.

[56] Jf. Betænkning nr. 1230, 1992, s. 88 og *Nis Jul Clausen & Karsten Engsig Sørensen*: Ekspertundersøgelse vedrørende åbenhed om aktiebesiddelser, 2000, s. 21, hvor det anføres, at storaktionær hverken i forbindelse med flagningsreglerne i VPHL eller ASL's oplysningspligter kan anvende nominee-ordningen. At spørgsmålet næppe er endeligt afklaret ses hos *Erik Werlauff*: Werlauff's kommenterede aktieselskabslov, 2002, s. 178, hvor det anføres, at det gennem ordet "enhver" er understreget, at status som ejer eller panthaver ikke er afgørende for anmeldelsespligten, men alene at man "besidder" aktierne, herunder eksempelvis gennem stemmeoverførselsaftale. For regler med det hovedformål at sikre, at selskabet har en person, som det kan kommunikere med eller som der kan udbetales udbytte til med frigørende virkning, er det ikke afgørende, om den anførte person er den reelle ejer eller en nominee, jf. *Nis Jul Clausen & Karsten Engsig Sørensen*: Ekspertundersøgelse vedrørende åbenhed om aktiebesiddelser, 2000, s. 21. Anderledes forholder det sig, såfremt der er tale om overvejelser om, hvorvidt selskabets aktionærer og offentligheden skal have kendskab til, hvem der er aktionærer i et bestemt selskab. Her er den reelle ejers identitet afgørende. Det samme gælder i forhold til opnåelse af omsætnings- og kreditorbeskyttelse gennem registrering i værdipapircentralen, hvor det er væsentligt at vide, om den registrerede kontohaver er den reelle ejer, jf. *Nis Jul Clausen & Karsten Engsig Sørensen*: Ekspertundersøgelse vedrørende åbenhed om aktiebesiddelser, 2000, s. 21.

[57] Se tilsvarende VPHL § 29, vedrørende børsnoterede selskaber (de såkaldte flagningsregler), som udgør en implementering af transparensdirektivet (dir. 88/627/EØF), og i detaljer hertil bekendtgørelse nr. 328 af 22.4. 1996.

[58] Jf. eksempelvis JP Morgans hjemmeside herom: www.adr.com og den tilsvarende hos Bank of New York: www.adrbny.com.

[59] Jf. The Global Equity Investment Guide - The Case for Investing in Depositary Receipts, Bank of New York, 2003, s. 5.

[60] En Custodian er en agent, der opbevarer værdipapirer for sine kunder og modtager udbytter og renter. I relation til Depositary Recepits besidder custodian de underliggende aktier.

[61] Jf. *Magnus Aarbakke* i TfR 1993, s. 59 ff.

[62] Op.cit., s. 71.

[63] Loc.cit.

[64] Op.cit., s. 72. Forfatteren analyserer specifikt stemmeretten, s. 73 f, anfægtelsesretten, s. 76 ff, retten til at kræve granskning, s. 78 ff.

[65] I specifik sammenhæng se tilsvarende I. A. Strobel: Maskeret udbytte, SkatteOrientering, S.4., 1998, s. 7 f.

[66] I TfS 2003, 409 V Nicolai Stærdal, blev der ikke tilladt fradrag for tab på aktier, idet ejerskab til disse ikke var godtgjort. I TfS 1993, 416 H Holdingselskabet Ebbe Petersen, Søndersø A/S, blev der ikke givet tilladelse til sambeskatning, idet der ikke fandtes at foreligge bevis for en aftale om overdragelse af aktier med henblik på opfyldelse af det nødvendige ejerskabskrav. Derimod fandtes et anpartshaverforhold at bestå i TfS 2003, 743 H Henrik Uhrenholt. Sagen drejede sig om, hvorvidt et ejendomsprovenu som skatteyderen havde fået tiltransporteret fra selskabet, skulle anses som maskeret udbytte, jf. LL § 16 A. Skatteyderen var direktør i selskabet og eneste ansatte og tegningsberettigede i selskabet. Skatteyderen påstod, at anparterne var solgt til en udlandsdansker og senere til et I/S og, at der var sket en afregning af provenuet overfor disse. Skatteyderen havde i forbindelse med selskabets tvangsopløsning for Sø- og Handelsrettens skifteafdeling forklaret, at han var ejer af anparterne, men trak senere i land. I selskabets anpartshaverfortegnelse stod udlandsdanskeren oplyst som ejer af anparterne. Højesteret lagde til grund, at skatteyderen var direktør og eneste ansatte og tegningsberettigede i selskabet, at han foretog alle væsentlige dispositioner vedrørende selskabet, herunder salg af selskabets eneste aktiv (en fast ejendom), at han på selskabets vegne underskrev transporterklæringen, hvorefter provenuet ved salget af ejendommen skulle udbetales til ham, at skatteyderens forklaring om baggrunden for transporten ikke nærmere var bestyrket og, at der ikke for Højesteret var fremlagt

dokumentation for pengeoverførsler, regnskabsmateriale eller andet, der kunne bestyrke forklaringerne om udlandsdanskerens og senere I/S'ets erhvervelse af anparterne. Endelig blev der lagt vægt på, at forklaringerne om videregivelse af provenuet af ejendomssalget ikke var søgt dokumenteret. Herved fandt Højesteret heller ikke grundlag for at betvivle rigtigheden af de oplysninger, der var tilført skifterettens retsbog, hvorefter skatteyderens havde forklaret, at anparterne ejedes af ham. På denne baggrund tiltrådte Højesteret, at anparterne reelt ejedes af skatteyderen og, at provenuet blev anset som en udlodning til ham.

[67] Jf. eksempelvis LSRM 1967.11, og LSRM 1968.94.

[68] Jf. *Henrik Peytz*: Aktieavancebeskatningsloven med kommentarer, 2003, s. 37.

[69] Jf. sagsforløbet i TfS 1996, 603 V Advokat A, og TfS 1984, 189 Ø Allan Jørgen Rosenvinge, hvor der ikke anerkendtes tabsfradrag for aktier erhvervet på baggrund af en kapitalforhøjelse, som ikke var blevet registreret. Tabet ansås i stedet som et formuetab, jf. SL § 5a. Som det ses holdes den formelle fane højt. Tilsvarende må det antages, at formalia vedrørende aktionærpositioner er afgørende når dette kan være til skatteydernes gunst.

[70] Herved bortses fra, at loven tillige finder anvendelse på andelsbeviser, konvertible obligationer, omsættelige investeringsforeningsbeviser mv., jf. ABL § 1, stk. 1, samt tegningsretter (warrants), jf. ABL § 1, stk. 2.

[71] Denne konstatering skal dog ikke forstås som en kritik, idet det hører til de absolutte undtagelsestilfælde, at der opstår tvivl om, hvem der er aktionær, anpartshaver mv. i lovens forstand.

[72] I SpO 2001, s. 62 ff.

[73] I UfR 2001, B, 421.

[74] I Hyldestskrift til *Jørgen Nørgaard*, 2003, s. 231.

[75] Modsat denne opfattelse anfører *Kurt Siggaard* imidlertid i TfS 2003, 435 med note 6, at Højesterets præmisser ikke nødvendigvis synes at føre til en sådan konklusion. Derimod antager forfatteren, at Højesteret har taget stilling til, at skatteyder ikke var ejer i civilretlig henseende, hvorfor han ej heller i skattemæssig henseende har været medejer.

[76] Jf. TfS 1998, 397 H *Kurt Hall Jørgensen, samt Henrik Peytz*: Aktieavancebeskatningsloven med kommentarer, 2003, s. 58, og Bent Ramskov: Intern selskabsomstrukturering, 2001, s. 136. Sidstnævnte finder s. 160, at skatteretten må antages tilnærmelsesvis at følge den civilretlige regulering fuldt ud ved en vurdering af, om der foreligger afståelse.

[77] Se om sagen *Ole Bjørn* i SR-Skat 1988, s. 134, *I. A. Strobel* i SpO 1998, s. 134 ff, *Bent Ramskov*: Intern selskabsomstrukturering, 2001, s. 136 ff (s. 138 ff), *Erik Werlauff* i TfS 1999, 237, og *Tommy V. Kristiansen* i JUS 1998/22.

[78] Det præcise tidspunkt for ophøret er selskabets afmelding i Erhvervs- og Selskabsstyrelsen, jf. TfS 2005, 45 LSR.

[79] Se også *Aage Michelsen* i Lærebog om indkomstskat, 2003, s. 98, og *Jacob Graff Nielsen*: Legalitetskravet ved beskatning, 2003, s. 326.

[80] Jf. bemærkningerne til § 2, nr. 6-8, i lov om særlig indkomstskat (lov nr. 256 af 11.6. 1960) i FT 1959-60, tillæg A, spalte 1069 ff. Disse bestemmelser videreførtes af § 1, stk. 2 og 3, i aktieavancebeskatningsloven, jf. FT 1980-81, tillæg A, spalte 3323 ff.

[81] Højesteret har tillige konstateret, at aktieavancebeskatningslovens regler om erhvervelsestidspunkt for aktier og anpartern mv. må forstås i overensstemmelse med obligationsrettens regler herom. Dette vil sige, at der sker erhvervelse ved ejendomsrettens overgang eller på anden måde, jf. TfS 2001, 235 H Brødrene Karlborg. Også dette resultat må antages at være et direkte udslag af almindelig lovfortolkning.

[82] Se hertil *Flemming Heden Knudsen* i R&R 1989 SM 104 ff, og *Ulrik Gorm Møller*: Skatterådgivning - metode og teknik, 1996, s. 134 f.

[83] Jf. Flemming Heden Knudsen op.cit.

[84] Se om denne praksis *Jan Pedersen*: Skatteudnyttelse, s. 288, s. 358 f, og s. 414 ff, og samme i Skatteretten 1, 2004, s. 444, og samme i Transfer pricing - i international skatteretlig belysning, 1998, s. 45 f, *Hanne Søgaard-Hansen* i Lærebog om indkomstskat, 2003, s. 513 f, samt LV 2005 S.G.4.5., om konstruerede tab. Også i norsk ret har spørgsmålet om fradrag for tab ved koncerninterne aktieoverdragelse påkaldt sig en

vis interesse, jf. Rt 2002, s. 456 HD Hydro. I valget mellem lovfortolkning eller anvendelse af den ulovfæstede omgåelsesklausul, blev sidstnævnte fremgangsmåde anvendt, selvom denne konkret ikke fandt anvendelse.

[85] Jf. UfR 1973, 408 Ø Industriaktieselskabet *John Meyer*, UfR 1965, 802 Ø, TfS 1986, 125 H A/S Handels Kompaniet Theokruma (U 1986, 295 H). Det er dog tillige blevet anført, at denne praksis vedrørende underkendelse af koncerninterne aktietab forudsætter, at de overdragne aktier så at sige "bliver i systemet", således at der alene er tale om et formelt, men ikke reelt ejerskifte - altså en forklaring af praksis efter realitetsgrundsætningen. Civilretligt må det antages, at der har foreligget reelle ejerskifter. Hertil må det dog bemærkes, at der intet er i præmisserne, der indikerer, at selve ejerskiftet underkendes.

[86] I TfS 1992, 156 Ø *Jens Amtoft*, ønskede en skatteyder at undgå konsekvenserne af ABL's ikrafttræden. Da der imidlertid forelå egentlige pro forma overdragelser tilsidesatte landsretten de foretagne aktiehandler. Der blev i denne forbindelse særligt henset til følgende forhold, der blev anset som værende så usædvanlige, at der måtte påhvile skatteyderen en dokumentationspligt: at der ikke var udstedt aktiebreve, at handlen skete på kredit uden angivelse af anden betalingstid, end at den indtrådte ved sælgers påkrav, og at sælger havde tilbagekøbspligt. Også i TfS 1986, 604 Ø *Ebbe Petersen*, var der tale om en overdragelse fra skatteyderen til et af denne helejet selskab umiddelbart inden ABL's ikrafttræden med henblik på at konstatere et tab. Skatteyderen tilbagekøbte aktierne det følgende år for 0 kr. Landsretten fandt, at skatteyderen ikke havde godtgjort, at der var sket en endelig overdragelse af aktierne, hvorfor der ikke kunne tillades tabsfradrag. Der blev herved henset til den omstændighed, at der var sket salg og genkøb.

[87] Jf. det ledende præjudikat i TfS 1999, 289 H Bygge & Finans A/S, der dog anerkendte tabsfradragsretten.

[88] Retstilstanden er vel imidlertid den, at stemmeretten i mangel af aftale forbliver hos pantsætter. Se *Erik Werlauff*: Generalforsamling og beslutning, 1983, s. 374, der konstaterer, at det er ganske sædvanligt at panthaver betinger sig stemmeretten.

[89] Dommen er kommenteret af *Jan Pedersen* i R&R 1999 SM 166 ff, *Ole Bjørn* i SR-Skat 1999, s. 214 f, og *Jan Gulmand Hansen* i SR-Skat 1999, s. 250 ff.

[90] En tilsvarende formulering er anvendt i TfS 1996, 469 H *Peter Charles Andreasen*, hvor et ejertidsnedslag vedrørende fast ejendom blev mindsket, idet der trods en samtidig køberet og købepligt i 1979 fandtes at være en sådan grad af usikkerhed om det videre kontraktsforløb, at ejendommen først kunne anses for erhvervet ved købet i 1984. 91 Sagen drejede sig som nævnt ovenfor om, hvorvidt en forkøbsret til aktier bestod og hvorvidt denne var blevet aktuel. Højesteret bemærkede at: "...De indgåede aftaler som helhed indebar en sådan råden over Svend Nielsens aktier og rettigheder, at de i forhold til de indstævnte ganske må sidestilles med en fuldbyrdet overdragelse af aktierne...". Se hertil *Erik Werlauff*: Generalforsamling og beslutning, 1983, s. 370.

[91] Sagen drejede sig som nævnt ovenfor om, hvorvidt en forkøbsret til aktier bestod og hvorvidt denne var blevet aktuel. Højesteret bemærkede at: "...De indgåede aftaler som helhed indebar en sådan råden over Svend Nielsens aktier og rettigheder, at de i forhold til de indstævnte ganske må sidestilles med en fuldbyrdet overdragelse af aktierne...". Se hertil Erik Werlauff: Generalforsamling og beslutning, 1983, s. 370.

[92] *Ole Bjørn* forudsætter dog i SR-Skat 1999, s. 214 f, at der i sagen var tale om et civilretligt gyldigt aftalekompleks. Endda antages det at være ubestrideligt, at der i civilretlig henseende ikke kunne anses for at have fundet en overdragelse sted. Forfatteren tager dommen til indtægt for, at der er sket en skatteretlig bedømmelse, der afviger fra den civilretlige og, at resultatet dermed er nået ud fra en skatteretlig realitetsbedømmelse. *Jan Pedersen* antager tillige i R&R 1999 SM 116, at der var tale om en gyldigt civilretligt aftale. Denne forfatter antager, at dommen ud fra en umiddelbar betragtning er vidtgående, men dog efter nærmere analyse ikke overraskende, idet aftalen efter forfatterens opfattelse kan sammenlignes med en resolutivt betinget aftale med en beskeden risiko for betingelsens indtræden. De facto opnås derfor fuld ejendomsret til aktierne allerede ved aftalens indgåelse. Set i dette lys finder forfatteren som nævnt ikke resultatet overraskende. Om forfatteren herved faktisk også mener, at der er sket civilretlig afståelse er ikke helt tydeligt.

[93] Jf. *Aage Michelsen* i Lærebog om indkomstskat, 2003, s. 99. Se dog den nævnte UfR 1960, 304 H.

[94] Jf. TfS 2002, 890 V *Per Dahl Knudsen*.

[95] En aktielåneordning kan udformes i mange varianter, men indebærer typisk, at långiver udlåner aktier til låntager på aftaletidspunktet. Formålet kan variere, men vil ofte være såkaldt baisse-spekulation eller i

forbindelse med aktie-emissioner. I løbetiden har långiver ret til at opsige aftalen. Eventuelle fondsaktieemissioner tilfalder långiver ved tilbageleveringen af aktierne, ligesom denne skal kompenseres for nytegninger. Låntager har derimod samtlige aktionærbeføjelser, og kan således i løbetiden disponere over aktierne, modtage udbytte, dog mod afregning heraf til långiver, uanset ejerskabet og råde over stemmeretten til aktierne. På forfaldstidspunktet tilbageleveres tilsvarende aktier (samme mængde og type), men ikke nødvendigvis de samme aktier. Det anføres direkte i Finansrådets og Børsmæglerforeningens standardvilkår for lån af aktier, at ejendomsretten til de lånte aktier overgår fra långiver til låntager. Se om disse vilkår Niels Neergaard & Helle Søby Thygesen i R&R 1999/8, s. 35 ff.

[96] Jf. TfS 1999, 408 LR, TfS 2002, 755 LR og TfS 2004, 152 LSR. Se om denne praksis LV 2005 S.G.2.3.3., *Bent Ramskov*: Intern selskabsomstrukturering, 2001, s. 145 ff, og *Henrik Peytz*: Aktieavancebeskatningsloven med kommentarer, 2003, s. 100 ff. Tidligere blev der med TfS 1989, 471 LR, anset at foreligge afståelse i tilfælde af aktieudlån til baissespekulation. Derimod blev der i TfS 1998, 357 LR, vedrørende en såkaldt "greenshoe" ikke anset at være sket afståelse. Begrundelsen fremgik dog ikke af afgørelsen.

[97] Jf. TfS 2002, 755 LR. Tidligere var praksis, at låntagers eventuelle gevinster og tab skulle beskattes i henhold til ABL, jf. TfS 2001, 146 LR. Denne praksis er nu - med rette - forladt. Det synes ikke holdbart på den ene side at konstatere, at aktielån ikke medfører ophør af en aktionærposition og på den anden side samtidig medfører etablering af en ny aktionærposition. Beskatning udløses, selvom dette ikke ser i henhold til ABL, som netop forudsætter tilstedeværelsen af en aktionærposition.

[98] Se også *Nikolaj Vinther*: Civilrettens styring af skatteretten, 2005, s. 56, der anser praksis for at tilpasse sig erhvervslivets behov.

[99] Sml. *Bent Ramskov*: op.cit., og SpO 1999, s. 185.

[100] Litteraturen herom er ganske omfattende. For en civilretlig behandling af emnet henvises til *Jørgen Nørgaard & Erik Werlauff*: Vedtægter og aktionæroverenskomst, 1995, og Bent Ramskov: Intern selskabsomstrukturering, 2001, s. 177 ff. Den skatteretlige litteratur omfatter Skatteministeriets redegørelse om retssikkerhed, 1992, s. 138 ff, Skattepolitisk Redegørelse, 1994, s. 126 ff, Betænkning nr. 1392/2000 om aktieavancebeskatning, *Jørgen Nørgaard & Erik Werlauff*: Op.cit., s. 149 ff, *Søren Rasmussen & Preben Underberg Poulsen*: Aktieavancebeskatning, 1995, s. 150 f, *Bent Ramskov*: Op.cit., s. 185 ff, LV 2005 S.G.2.3.1.2., Henrik Peytz: Aktieavancebeskatningsloven med kommentarer, 2003, s. 91 ff, *Eivind Christiansen*: Beskatning af aktionærer, 1998, s. 45 ff, *Susanne Nørgaard* i SR-Skat 1991, s. 79 ff, *Ole Bjørn* i SR-Skat 1992, s. 80 f, samme i SR-Skat 1992, s. 184 f, og samme i SR-Skat 1993, s. 320 f, *Svend Erik Holm* i R&R 1992 SM 175, samme i TfS 1993, 419, og *Niels Kristensen & Knud Tarnø* i RBL 1989/8, s. 33 ff, samt senest *Nikolaj Vinther*: Civilrettens styring af skatteretten, 2005, s. 285.

[101] Jf. LV 2005 S.G.2.3.1.2. Momenterne indebærer først og fremmest en identitetsvurdering af aktien, ved at undersøge indholdet af vedtægtsændringerne. Desuden indgår aktionærkredsens sammensætning sammenholdt med bevæggrundene for vedtægtsændringerne, samt hvad der skattemæssigt og økonomisk i øvrigt opnås herved. Disse momenter kritiseres af *Bent Ramskov*: Intern selskabsomstrukturering, 2001, s. 185 ff.

[102] Jf. R&R 1981 SM 187 SD, TfS 1988, 705 LR, TfS 1992, 130 LR, TfS 1992, 345 LR, TfS 1993, 285 LSR og TfS 1985, 170 LSR.

[103] Jf. TfS 1989, 7 LR, TfS 1989, 536 LR og TfS 1994, 133 LSR.

[104] Jf. TfS 1989, 78 LR.

[105] Sml. *Henrik Peytz*: Aktieavancebeskatningslovens med kommentarer, 2003, s. 93, og *Hanne Søgaard Hansen* i Lærebog om indkomstskat, 2003, s. 508. *Bent Ramskov* kritiserer i Intern selskabsomstrukturering, 2001, s. 185, grundlæggende den skitserede praksis og betegner dele heraf som fejlagtig. Forfatteren anfører, at vedtægtsændringer i civilretlig henseende ikke kan antages at indebære en ændring i ejerforholdet til aktien, idet dette fortsat består hos den hidtidige aktionær. Derimod antages det, at der kan være tale om afståelse af begrænsede rettigheder, hvilke dog efter forfatterens opfattelse ikke kan beskattes i medfør af ABL. Modsat dette anfører *Erik Werlauff* i UfR 2001 B., s. 421, at væsentlige og indgribende vedtægtsændringer efter en konkret bedømmelse kan sidestilles med afståelse, hvis de reelt har medført en identitetsændring for de berørte aktier. Tilsvarende ses hos *Nikolaj Vinther*: Civilrettens styring af skatteretten, 2005, s. 285 ff, at antage, at

afståelsesbegrebet i ABL § 1, stk. 2, hjemler mulighed for, at en vedtægtsændring, der fører til en formueoverflytning, medfører at aktierne anses for afstået. Samme forfatter konkluderer, s. 273, at civilrettens styring inden for dette område må erkendes at være svag, idet hensynet til fiscus' tredjemandsposition gør, at det er berettiget at fortolke det skatteretlige afståelsesbegreb under hensynstagen hertil. At dette skulle være baggrunden for praksis ses der ikke at være holdepunkter for.

[106] Afgørelsen støtter synspunktet om, at en realitetsbedømmelse ikke tilkommer skatteyderne, herunder ikke hvor der ikke foreligger den fornødne forudsætning om skatteudnyttelse.

[107] En sjælden undtagelse hertil er fremkommet på skattestrafferettens område, jf. TfS 1994, 20 Ø (straffesag), hvor tiltalte blev anset for at have modtaget en udlodning fra et anpartsselskab trods den omstændighed, at vedkommende ikke var anpartshaver i selskabet. Landsretten nåede resultatet ud fra den betragtning, at tiltalte havde disponeret over selskabets midler som sine egne og at tiltalte havde haft en faktisk eneråden over selskabet svarende til dispositionsretten i et enkeltmandsfirma.

[108] Sml. i internationalt perspektiv *Marjaana Helminen*: The Dividend Concept in International Tax Law, 1999, s. 145. Noget tilsvarende gør sig gældende i forhold til moder-/datterselskabsdirektivet (90/435/EØF), jf. art. 3.

[109] Jf. LV 2005 S.G.2.4.3.

[110] Købelovens § 19 regulerer som nævnt sælgers ret til udbytte. Bestemmelsen medfører, at køb af en aktie omfatter det udbytte, som ikke var forfaldent på tidspunktet for aftalens indgåelse. Optjening er ikke nok, der skal foreligge beslutning om udlodning og kravet skal være forfaldent. Når sælger i forhold til køber har retten til et krav på udbytte, kan han gøre kravet gældende mod selskabet, selv om hans ret til aktien er ophørt. Selvom overdrageren har mistet retten til at oppebære udbytte, kan han være legitimeret til at modtage udbytte med frigørende virkning, jf. ASL § 24.

[111] Der var her tale om, at en tidligere hovedaktionær i forbindelse med et generationsskifte solgte sin resterende aktiepost til et andet selskab. Salget fandt sted i januar 1984. Ved salget betingede hovedaktionæren sig udbyttet for regnskabsåret 1983, som blev deklareret i august 1984. Landsskatteretten fandt, at skatteyderen med rette ved opgørelsen af sin skattepligtige indkomst havde medregnet såvel udbyttet som skattegodtgørelse heraf. Med hensyn til udbyttet måtte hovedaktionæren nemlig anses som udbyttemodtager, jf. SEL § 17 A (nu ophævet). TfS 1992, 540 TSS, vedrørte et tilfælde, hvor en række aktionærer benyttede et købstilbud fra en storaktionær til at sælge deres aktieposter. Aktionærerne havde forbeholdt sig 1 års udbytte af aktierne. Udbyttet blev vedtaget af generalforsamlingen en uge efter aktiesalgene. Told- og Skattestyrelsen udtalte, at det udbetalte udbytte også skattemæssigt skulle behandles som udbytte for de aktionærer, der havde benyttet sig af købstilbuddet. Styrelsen lagde herved vægt på den ovenfor refererede landsskatteretsafgørelse. Afgørelsen er kommenteret af *Ole Bjørn* i SR-Skat 1992, s. 401 f. Forfatteren finder, at resultatet overraskende og i strid med hidtidig opfattelse, idet afgørelsen tilsyneladende indebærer, at udbytte i skatteretlig henseende kan adskilles fra ejendomsretten til de aktier, der betinger udbyttet. Afgørelsen er tillige kommenteret af *N. Mou Jakobsen* i R&R 1993 SM 4. Landsskatteretten har ikke nærmere uddybet rationalet bag afgørelsen. Told- og Skattestyrelsen havde i sagen argumenteret for, at sælger i sagen civilretligt ikke kunne forbeholde sig til udbytte, idet de selskabsretlige udbytteregler i ASL § 109, og § 110, forudsætter, at udbytte alene kan uddeles til aktionærerne. Trods dette udsagn er det vel almindeligt antaget, at de økonomiske rettigheder kan overdragelse særskilt. Resultatet er da også i strid med den civilretlige retstilstand i.h.t. KBL § 19, idet køber herefter har retten til vedhængende udbytte, der endnu ikke er forfaldent med mindre andet er aftalt. Resultatet kan dog måske tilskrives en ordlydsfortolkning af den ophævede bestemmelse i SEL § 17 A, hvorved skatteyderen måtte anses for at være "udbyttemodtager" i overensstemmelse hermed. Det er dog uklart, hvordan en betaling i almindelighed kan kvalificeres som udbytte, hvis ikke modtageren er aktionær. LL § 16 A foreskriver jo netop, at udbytte i skatteretlig henseende er alt hvad et selskab udlodder til dets aktionærer. På nævnte baggrund kunne det tænkes at kendelsen var en enlig svale.

[112] Jf. herom *N. Mou Jakobsen* i R&R 2003 SM 238.

[113] Jf. også *N. Mou Jakobsen* i R&R 2003 SM 238.

[114] Sagen er kommenteret af *Ole Bjørn* i SR-Skat 2003, s. 332 ff.

[115] En stichting er særskilt reguleret i hollandsk ret og har væsentlige lighedstræk med en fond. En stichting vil ofte have det som sit eneste formål at råde over forvaltningsmæssige rettigheder vedrørende aktier.

[116] Problemstillingen har tillige aktualitet ved udbyttebetalinger fra udenlandske selskaber som følge af præferenceaktier, hvor de økonomiske rettigheder overstiger den formelle aktiebesiddelse og de forvaltningsmæssige rettigheder. Også i disse situationer vil udbytteretten ikke udtrykke ejerandelen i selskabet og dermed have betydning ved vurderingen af om kriteriet i SEL § 13, stk. 1, nr. 2, er opfyldt.

[117] Jf. TfS 2001, 146 LR.

[118] Bestemmelsen sigter mod skatteudnyttelse.

[119] Jf. pkt. 1 og 15, i OECD's kommentarer til art. 10. Dog kan der argumenteres for, at det ikke er et krav, at en aktionær skal modtage udbyttet, det er tilstrækkeligt, at der er tale om indkomst fra aktier. En indehaver af en udbytteret kan således modtage betalinger herfra som udbytte og nyde overenskomstbeskyttelse, idet betalingen jo sker i kraft af aktionærens aktionærstatus, men at beneficial owner til udbyttet er indehaveren af udbytteretten, jf. *Marjaana Helminen*: The Dividend Concept in International Tax Law, 1999, s. 160. Der kan også argumenteres for, at klassifikaiton som udbytte forudsætter, at indkomstmodtageren i det mindste på et eller andet tidspunkt har været aktionær, jf. Klaus Vogel: On Double Taxation Conventions, 1997, og samme Dobbelbesteuerungabkommen, 2003, art. 10-12, margin nr. 192.

[120] Jf. *Marjaana Helminen* i ET 2002, s. 454.

[121] 2002-ændringerne af kommentarerne er kommenteret af *H. Pijl* i Intertax, 2003, s. 353 ff.

[122] Se kort herom *I. A. Tokley*: Company Securities - Disslosure of Interests, 1995, s. 25 f.

[123] Jf. *Charl P. du Toit*: Beneficial Ownership of Royalties in Bilateral Tax Treaties, 1999, s. 99 ff.

[124] Jf. International Bureau of Fiscal Documentation i ET 1981, s. 141 og 143.

[125] Se for dansk ret *Nikolaj Bjørnholm* & *Anders Oreby Hansen*: Lempelse af dobbeltbeskatning, 2002, s. 449 f.

[126] Jf. *Charl P. du Toit*: Beneficial Ownership of Royalties in Bilateral Tax Treaties, 1999, s. 145 ff, *Marjaana Helminen* i ET 2002, s. 456, og *Klaus Vogel*: On Double Taxation Conventions, 1997, samme Dobbelbesteuerungabkommen, 2003, art. 10-12, margin nr. 8 ff, om end med en anden begrundelse.

[127] Jf. *Charl P. du Toit*: Beneficial Ownership of Royalties in Bilateral Tax Treaties, 1999, s. 201, s. 244 og s. 249. Af sådanne attributes nævnes: "...the right to posess, use, manage, the income, the capital...plus the risk of depriciation and the hope of appreciation...". For så vidt angår civil law lande foreslås det, at man kan tillempe begrebet ved at anse konstruktionen som en ejendomsret, der undergives visse begrænsninger i forhold til andre personer, frem for som en deling af ejendomsretten. Fra et traktatsynspunkt er det opgaven at identificere den person, der har den største ret til udbyttet.

[128] Jf. *Klaus Vogel*: On Double taxation Conventions, 1997, art. 10-12, margin nr. 9. Forfatteren sammenfatter bedømmelsen således: "...Hence, the "beneficial owner" is he who is free to decide (1) whether or not the capital or other assets should be used or made available for use by others or (2) on how the yields therefrom should be used or (3) both...". Se samme sted i Dobbelbesteuerungabkommen, 2003.

[129] Hidtil har det i retslitteraturen været opfattelsen, at begrebet beneficial owner (retmæssig ejer) næppe har nogen større betydning i de danske dobbeltbeskatningsoverenskomster, idet man ved iagttagelse af de nødvendige juridiske formaliteter uden besvær vil kunne opfylde kravet om at være retmæssig ejer, jf. *Aage Michelsen*: International skatteret, 2003, s. 427, og samme med *Steen Askholdt* i Cahiers de droit fiscal international, Vol. 72a, 1987, s. 281 ff, og *Henrik Calum Nielsen* i R&R 1986, s. 304, og *Jørn Quiste & John F. Avery Jones* i R&R 1985, s. 241. Dog således at sidstnævnte synes at lade spørgsmålet afhænge af de enkelte personers rettigheder og pligter, og henviser til ejendomsretsbegrebets relationsafhængige karakter.

[130] Jf. *Maarjana Helminen*: The Dividend Concept in International Tax Law, 1999, s. 143 og samme i ECTR 2003, s. 161 ff. Terminologien er ikke klar, og begrebet kan også over følgende: "...A tax avoidance device whereby a company which has reserves of accumulated taxed profits is purchased and the profits are fully distributed as dividends in respect of which tax relief is available...", jf. International Tax Glossary, s. 96.

[131] Jf. *Maarjana Helminen*: The Dividend Concept in International Tax Law, 1999, s. 143.

[132] Udbyttebetalinger fra en dansk selskab til en sådan aktionær vil blive pålagt 28% i kildeskat, jf. KSL § 2, stk. 1, litra f) og SEL § 2, stk. 1, litra c), jf. KSL § 65.

[133] Dividend stripping har tillige foregået i norsk ret. I norsk skatteret er ejeren af aktierne på tidspunktet for generalforsamlingens vedtagelse af udlodningen skattepligtig heraf. Skatten reduceres med den betalte

selskabsskat for norske aktionærer men ikke for udenlandske aktionærer. Udenlandske aktionærer har kunnet undgå kildeskat på udbytte ved at sælge aktierne til en indlænding umiddelbart før beslutningen om udbytteudlodning, og kort tid herefter at tilbagekøbe aktierne. I en del tilfælde har de udenlandske aktionærer tillige kontrolleret aktierne i "salgsperioden" gennem finansielle instrumenter. De norske ligningsmyndigheder har i flere tilfælde underkendt sådanne transaktioner, med udgangspunkt i den særlige "gjennomskjærings"-doktrin. Herefter har overførelsen af ejendomsretten været accepteret men tillagt andre skatteretlige effekter end normalt. I enkelte tilfælde har udlændingenes kontraktsbaserede rettigheder været så omfattende, at de har været anset som ejeren, selvom den norske indlænding har været registreret som ejer, jf. herom *Hugo P. Martre* i NTS 2001, s. 401 f. Dividend stripping benyttes af *Bettina Banoun* som samlebetegnelse for aktionærdisposititioner, hvor der overføres midler fra selskab til deltager uden almindelig udbyttebeskatinng qua en udnyttelse af strukturforskelle i skattesystemet, jf. Omgåelse av skattereglene, 2003, s. 195 ff. I 2002 blev der i Holland indført særlige regler til værn mod dividend stripping, jf. kritisk herom *Marjaana Helminen* i ET 2002, s. 454 ff, men modsat H. Pijl i Intertax, 2003, s. 353 ff. I tysk ret findes der tillige særlige regler til modvirkning af dividend stripping, jf. EstG § 20(2)(a), hvorefter indkomst fra en aktie tilfalder aktionæren, forstået som ejeren af aktien på tidspunktet for beslutningen om udlodning af udbytte. Tilsvarende beskattes det modtagne vederlag for afståelse af udbytteretten som udbytte, jf. EstG § 20(1)(2)(a).

[134] Jf. *Marjaana Helminen*: The Dividend Concept in International Tax Law, 1999, s. 159.

[135] Se *Marjaana Helminen*: The Dividend Concept in International Tax Law, 1999, s. 153 f, med en tilsvarende konstatering for US-ret, idet man her efter læren om træet og frugterne (rette indkomstmodtager) vil beskatte udbytterne, hvor de er optjent. Det samme gælder tysk ret, svensk ret og finsk ret, op.cit. Spørgsmålet afhænger dog ikke alene af intern ret, idet en eventuel begrænsning af en gunstig behandling af udbytte ikke må være i strid med indgående dobbeltbeskatningsoverenskomster. En udbyttemodtager kan således ikke efter intern ret begrænses i sin adgang til den gunstigere skattemæssige behandling, hvis modtageren i overensstemmelse med art. 10 i OECD MDBO må anses for at være "beneficial owner" af udbyttet.

[136] Jf. *Michael Serup*: Generationsskifte - omstrukturering, 2004, s. 565 ff, og samme Fusionsskatteloven med kommentarer, 2003, s. 464 ff og samme i TfS 2000, 551. Se generelt om forståelse af fusionsdirektivet (90/434) på dette punkt *Otmar Thömmes m.fl.*: EC Corporate Tax Law, ad. art. 2, pkt. 57 ff.

[137] Jf. *Michael Serup* i Fusionsskatteloven med kommentarer, 2003, s. 470 ff.

[138] Jf. LV 2005 S.G. 18.3., og *Susanne Kjær* i SR-Skat 2000, s. 133. Derimod er det næppe rigtigt, når det i LV 2005 S.G. 18.3., og TfS 2001, 590 LR, antages, at aktieombytning tillige kan nægtes, hvis en sådan indskrænkning ligger på bestyrelses- og direktionsplan. Som anført af Michael Serup: Fusionsskatteloven med kommentarer, 2003, s. 469 ff og samme i TfS 2000, 551, savner denne praksis retligt grundlag. Det anføres, at stemmeretskravet må forstås i overensstemmelse med den underliggende selskabsret, hvorefter det er stemmeretten på generalforsamlingsniveau, der er afgørende for adgangen til aktieombytning. Dermed kan der ikke stilles krav om en kvalificeret mulighed for udnyttelse af stemmeretten, herunder om en bestemmende indflydelse på det erhvervede selskab. I TfS 2005, 132 LSR, blev anmodning om aktieombytning afslået, idet en samarbejdsaftale og aktionæroverenskomst bevirkede, at den formelle majoritet ikke tillige var reel.

[139] I tidligere administrativ blev anmodninger om aktieombytning afslået, hvis 50/50 aktionærer midlertidigt overdrog minimale aktiebesiddelser til hinanden for at muliggøre holdingstiftelser for begge parter. Det antages nu at være fast praksis, at der gives aktieombytningstilladelse også i sådanne situationer, med mindre der konkret foreligger dispositioner uden realitet. Se Ane Sandager i TfS 1999, 528, og Michael Serup: Fusionsskatteloven med kommentarer, 2003, s. 466 f.

[140] Sagen vedrørte tiden før der i 1995 tillige blev indført en tilladelsespraksis vedrørende aktieombytninger.

[141] Denne mulighed og muligheden for at tilsidesætte proformaoverdragelser noteres tillige af Michael Serup i TfS 2000, 551.

[142] Jf. *Michael Serup* i TfS 2000, 551, og samme Fusionsskatteloven med kommentarer, 2003, s. 468, LV 2005 S.G. 18.3., og TfS 1998, 678 LR.

Til anvendelse i henhold til Karnov Groups Licensvilkår