# Exhibit 3

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 26MT

June 12, 2024

Opus 2 - Official Court Reporters

Phone:  020 3008 6619

Email:  transcripts@opus2.com

Website:  https://www.opus2.com

1    Wednesday, 12 June 2024
2    (9.30 am)
3                    Housekeeping
4    MR JUSTICE ANDREW BAKER:  Good morning, Mr Shah.
5        I don't know whether you can see on the screen,
6    Mr Head is on his feet so it may be he wants to raise
7    something with me before we proceed any further.
8        Mr Head, any difficulty about Mr Shah being with us
9    while you are raising whatever it is you are going to
10   raise?
11   MR HEAD:  No, on the contrary, my Lord, the reason I am on
12   my feet is because we have one short and discrete
13   further point of cross-examination, subject to your
14   lordship of course.  The reason I raise it now and
15   didn't raise it previously is because it arises out of
16   Mr Shah's fifth witness statement, the manuscript set of
17   amendments that he provided during the course of his
18   evidence.  I have discussed it with my learned friends,
19   there is no objection from anyone, so if it your
20   Lordship doesn't object I will just ask that
21   additional --
22   MR JUSTICE ANDREW BAKER:  Let me just double-check.
23   Mr Jones?
24   MR JONES:  My Lord, yes.  The fifth witness statement arose
25   from what my client said in cross-examination, it

                                1

1    doesn't seem to me that I can have any objection to this
2    at all.
3    MR JUSTICE ANDREW BAKER:  Mr Rabinowitz?
4    MR RABINOWITZ:  No objection, my Lord.
5    MR JUSTICE ANDREW BAKER:  Thank you very much.
6        Mr Shah, I don't know whether you follow that
7    explanation, you will remember the process we went
8    through which I slightly triggered that resulted in your
9    short manuscript fifth statement, so that therefore only
10   arose in effect as a supplement to your original
11   evidence-in-chief during the course of your
12   cross-examination and Mr Head on behalf of the DWF
13   defendants has indicated he has just question or two or
14   three to ask you arising out of that and I'm permitting
15   that to happen, all right.
16   A.  Thank you, my Lord.
17   MR JUSTICE ANDREW BAKER:  So there's a few questions from
18   Mr Head before we get to your re-examination.  Thank
19   you, Mr Head.
20                    MR SANJAY SHAH (continued)
21             Further cross-examination by MR HEAD
22   MR HEAD:  Thank you, my Lord.
23        Good morning, Mr Shah.
24   A.  Good morning.
25   Q.  I will be very brief.  Can I ask you firstly to look at

                                2

1    your first witness statement, please.  The reference is
2    {V/27/125} and I would like you to look in particular,
3    please, at paragraph 692 and this is where you deal with
4    your -- the financial relationship with
5    Anupe Dhorajiwala.  You see there that you confirm that
6    you didn't enter into a profit share agreement with
7    Anupe relating to the Solo WHT scheme and you say that:
8        "After Raj left Solo, I offered to give Anupe the
9    deal that Raj had been on (ie profit-sharing agreement
10   alongside me and Graham)."
11       Do you see that?
12   A.  Yes, I see that.
13   Q.  And in that witness statement at least there is no
14   suggestion that an agreement was concluded or that
15   payments were made.  You would agree with that?
16   A.  Yes.
17   Q.  Let me next show you, please, what Mr Dhorajiwala says
18   about that.  If we can go, please, to {Y17/34/41}.
19   Page 41 of that document, please.  This is
20   Mr Dhorajiwala's witness statement.  Thank you.  And if
21   you could look, please, at paragraph 92 and in
22   particular starting from the fourth line, Mr Dhorajiwala
23   responds to an allegation that SKAT has made.  Just
24   pausing there, I'm not going to go to it, but just for
25   your Lordship's note, that is an allegation that SKAT

                                3

1    makes at schedule 5 appended to the particulars of claim
2    which is at {B/44.1/5}.
3        Responding to that allegation he says:
4        "I understand that SKAT has alleged that Sanjay and
5    I agreed I would be entitled to at least 20% of the net
6    income earned by Ganymede from WHT applications at least
7    from April 2013.  This is not correct.  We had
8    a discussion about this but no agreement was reached and
9    it was not something I pushed for at the time."
10       So you see what he says there?
11   A.  Yes, I see that.
12   Q.  Then going now, please, to your fifth witness statement,
13   the manuscript document that you produced during the
14   course of your oral evidence to the court, and that is
15   at {V/39/2}, please.  You are dealing with
16   paragraph 687, at the top of the page, of your original
17   witness statement.  Again, I don't think we need to go
18   to it, but that is a section which deals with various
19   items of remuneration and you see in (iii) of that
20   manuscript note you say that:
21       "Anupe was paid 20% of Ganymede's profits from when
22   Raj left until when he (Anupe) left Solo."
23       So in your fifth witness statement you appear to go
24   further or to give a slightly different account from
25   that in your first witness statement and you suggest

                                4

1  correspondingly but not exactly matching as a matter of
2  arithmetic a loss on the futures hedge.
3  MR GOLDSMITH:  Yes.
4  MR JUSTICE ANDREW BAKER:  And because they don't correspond
5    exactly, there is then still at that point
6    a differential that is not exactly matched by the
7    combination of the net dividend figure and the various
8    interest rate related elements and stock lending fees
9    and so on.  I have got all of that.
10  MR GOLDSMITH:  Yes.
11  MR JUSTICE ANDREW BAKER:  But am I right then to think that
12    the page 94 reference to stock lending interest of
13    557,158, if that is lifted from the statement, that will
14    be a figure that has been calculated using a daily mark
15    to market basis for doing the interest calculation that
16    did not match the trade confirmation if the trade
17    confirmation for the stock loan says "fixed cash pool"
18    and, going back to the point you and I did discuss
19    yesterday, the cash —— the principal cash collateral
20    amount as posted in the accounts was on day one the full
21    equity purchase and then from day two forwards the full
22    equity price minus the net dividend amount?
23  MR GOLDSMITH:  So the oddity, my Lord, is that for the
24    principal amount of the cash collateral it is mark to
25    market, as we saw yesterday, and that is why at the end

9

1    of the day the cash collateral returned matches the
2    unwind equity price.
3  MR JUSTICE ANDREW BAKER:  Yes.
4  MR GOLDSMITH:  But the interest actually is not mark to
5    market.  I didn't take Mr Shah to that yesterday because
6    he accepted ——
7  MR JUSTICE ANDREW BAKER:  We did deal with that on Day 20MT,
8    and perhaps I'm forgetting that.
9  MR GOLDSMITH:  Yes, we can look at it now, if you like.
10  MR JUSTICE ANDREW BAKER:  Don't worry.
11  MR GOLDSMITH:  But in essence the formula is original cash
12    collateral minus dividend compensation payment minus
13    accrued interest and then times the multiplier for the
14    interest rates, so that figure actually is not based on
15    the mark to market.
16  MR JUSTICE ANDREW BAKER:  Although in that section of the
17    statement that one would get to by looking up page 94
18    you do in fact end up seeing lots of those individual
19    day by day, mark to market numbers ——
20  MR GOLDSMITH:  Yes, yes.
21  MR JUSTICE ANDREW BAKER:  —— and a few columns away you see
22    also a daily interest amount, that daily interest amount
23    figure is not in fact being calculated by reference to
24    those current mark to market daily value numbers.
25  MR GOLDSMITH:  Exactly, my Lord.

10

1  MR JUSTICE ANDREW BAKER:  That is the detail I had
2    forgotten.  That is very helpful for me, thank you,
3    Mr Goldsmith.
4      My other point, it does relate to the same topic but
5    this time will give rise to a question for Mr Shah from
6    me before I then ask you to re—examine, Mr Jones.  Can
7    we have back on screen the part of Mr Shah's evidence
8    that Mr Goldsmith used yesterday as a starting point for
9    some of his additional questions, so that is Day 20MT
10    and I am interested in page 137, please.
11    {day20MT/137:9}.
12      Do you remember, Mr Shah, Mr Goldsmith going back to
13    this passage of your evidence yesterday and then he had
14    various additional questions, all right?
15  A.  Yes.
16  MR JUSTICE ANDREW BAKER:  I am not by any means wanting to
17    go back over what you were asked about yesterday, if
18    there are questions in re—examination from Mr Jones
19    about that, that is a matter for him.  It is a different
20    but quite specific point that I was reminded of that
21    I should perhaps have asked about back on Day 20MT, but
22    there it is.
23      Do you see at line 9 you say, and it is one of the
24    occasions where you say something of this type, that you
25    think what has happened is that there has been in effect

11

1    an error or you then call it "a bug" at the stage of
2    initially producing statements that had to be corrected
3    later, all right.  That is what you say and I'm not
4    going to go back over that.
5      But what you do then say at line 12 when you call it
6    a bug, you say, and 13:
7      "Answer:  ... I don't know if that was fixed later
8    on when the statements were automated ..."
9      Do you see that?
10  A.  Yes, I see that.
11  MR JUSTICE ANDREW BAKER:  When you talk there about an
12    automated process for producing statements, is that part
13    and parcel of what becomes Octave and Brokermesh and all
14    of that, or is that something different?
15  A.  No, that's my understanding from 2015 when the trading
16    was automated, I believe that the statement production
17    was automated.  I don't know for sure.  That is what
18    I think should have happened.
19  MR JUSTICE ANDREW BAKER:  Just in terms of what your
20    evidence was and what you meant by that answer, you had
21    in mind, are you saying, that documents equivalent to
22    the client—facing account statements that Mr Goldsmith
23    was going through with you once Brokermesh and Octave
24    were online were all produced as part and parcel of that
25    automated system?

12

1   A.  Yes, TAS recorded all the historic data, so it would
2       have been possible to produce an automated statement
3       from using the data in TAS.
4   MR JUSTICE ANDREW BAKER:  All right, thank you very much.
5       I don't have anything else.  That clarifies for me what
6       you meant by that particular reference to automation.
7       Thank you.
8           Yes, Mr Jones.
9   MR JONES:  My Lord, I just want to introduce what I am going
10      to say, both for your Lordship's benefit and for
11      Mr Shah's.
12  MR JUSTICE ANDREW BAKER:  Yes, thank you.
13  MR JONES:  We have done some uploads into Opus yesterday for
14      the purposes of this re—examination.  There is some
15      issue that has arisen as to whether one or two or a few
16      of those documents have previously been disclosed.  I am
17      pretty confident that we will resolve that so your
18      Lordship is not going to be troubled by it.  If
19      I stumble from time to time, it is because I'm trying to
20      ensure that the teams behind me and to my left can
21      resolve that before I get to those, and therefore I may
22      pass over a subject, Mr Shah, and come back to it.
23          But if I do, that's the reason and I'm hoping your
24      Lordship will not be troubled with it and Mr Shah won't
25      be either.

13

1   MR JUSTICE ANDREW BAKER:  All right, thank you.
2           Re—examination by MR JONES
3   MR JONES:  Mr Shah, good morning.  I am going to try and
4       give you and everyone else subject headings as we go
5       through so you have a moment to understand the subject
6       that I want to ask you about.
7           The first one, please, is PwC's resignation.  And in
8       order to ask you a few questions about that, could we
9       have up on screen the transcript for {day17MT/81} and
10      {day17MT/82}.  If they could be put side by side, that
11      would be very helpful.
12          Whilst that is being done, Mr Shah, you were asked
13      questions about the resignation of PwC in relation to
14      the Broadgate Fund transaction and I just want to remind
15      you of two parts of that evidence.
16          The first part is on page 81 and would you read,
17      please, your answer between lines 14 and 18.  Just read
18      it to yourself.
19  A.  Okay.  Yes, I can see it now.
20  Q.  14 to 18.
21  A.  Okay, I have read that.
22  Q.  Thank you.  If you look on the right—hand page, that
23      should be page 82, would you read to yourself, the
24      question put to you and your answer, which you will find
25      between lines 9 and 20.  {day17MT/82:9}.

14

1   A.  Okay.  Okay, I have read the question and the answer.
2   Q.  Thank you very much.  I'm now going to ask you some
3       questions in a moment about the rebuttal letter that you
4       referred to in the last sentence of your answer.  So
5       those two documents can go.  Could they be replaced,
6       please, with {MTKC1/145/4}.
7           So if we can go towards the top of page 4, this is
8       an email sent from Guenther Grant—Klar to you and
9       Mr Rajen Shah, setting out the draft text of the
10      proposed response to PwC.  If you want to see page 3,
11      just to remind yourself of that, please say so.  But do
12      you recall receiving that draft text?
13  A.  Yes, I do recall that draft.
14  Q.  Thank you.  If then, please, we could go to page
15      {MTKC1/145/1} of this document.  Thank you.  We can see
16      halfway down the page that Mr Rajen Shah provides
17      comments in two emails, the first of which is 7 December
18      at 19:38 and the second is a little later, at 19:54.  If
19      you would read those two emails to yourself, please.
20  A.  Okay.  Okay, I have finished that.
21  Q.  Thank you.  Would you read then at the top of the page
22      your response with your own comments, just to remind
23      yourself of what you said in 2010.
24  A.  Okay, thank you.  I have read that.
25  Q.  Thank you very much.  May we now go, please, new

15

1       document, to {MTKC1/146/1}.  I want page 1 of it,
2       please.  Thank you.  So in the middle of the page can
3       you see an email from you to Mr Murphy at PwC, saying:
4           "Please see attached letter and kindly confirm
5           receipt."
6   A.  Yes, I can see that.
7   Q.  Do you recall sending him a letter —— that's the first
8       question, do you recall doing that?
9   A.  Yes, yes, I would call that the rebuttal letter.
10  Q.  And that's the rebuttal letter that you were referring
11      to in your answers to Mr Rabinowitz?
12  A.  Yes, that was the one that was drafted by
13      Guenther Grant—Klar on the previous email.
14  Q.  Now, we can't see the attachment there, but the
15      attachment is at MTKC1 ——
16  MR JUSTICE ANDREW BAKER:  Just before we leave that
17      document, is that you in the top email, then, forwarding
18      that to Mr Markowitz, one of the Argre principals and
19      attaching the letter as actually sent to PwC?
20  A.  Yes, that would be that, and the context is that
21      Richard Markowitz was one of the investors in the fund.
22  MR JUSTICE ANDREW BAKER:  Yes.  Thank you.
23  MR JONES:  I am grateful.
24  MR JUSTICE ANDREW BAKER:  So the reference you are going to,
25      giving it a trial reference, is this PwC underlying

16