# Exhibit 41

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2                  CASE NO.  18-MD-2865 (LAK)

 3      _____
                                              )
 4      IN RE:                                )
                                              )
 5      CUSTOMS AND TAX ADMINISTRATION OF     )
        THE KINGDOM OF DENMARK                )
 6      (SKATTEFORVALTNINGEN) TAX REFUND      )
        SCHEME LITIGATION                     )
 7                                            )
        This document relates to case nos.    )
 8      19-cv-01783; 19-cv-01788; 19-cv-01794; )
        19-cv-01798; 19-cv-01918             )
 9      _____)

10

11

12              C O N F I D E N T I A L

13          SUBJECT TO THE PROTECTIVE ORDER

14

15

16      REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

17                    EXAMINATION OF

18                  RICHARD MARKOWITZ

19                 DATE: April 8, 2021

20

21

22

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 13

```
 1    R I C H A R D   M A R K O W I T Z ,

 2              called as a witness, having been first

 3    duly sworn according to law, testifies as follows:

 4

 5

 6

 7    EXAMINATION BY MR. WEINSTEIN:

 8         Q    Good morning, Mr. Markowitz.

 9              MR. BONGIORNO:  Marc, before we get

10         going, I just wanted to mention that

11         Mr. Markowitz is diabetic and we're

12         going to have to just keep a close eye

13         on his levels.  So every, I don't know,

14         45, 50, 55 minutes or so, we're just

15         going to ask that he check it, see

16         whether or not he needs a break or a

17         snack or anything.  But I didn't want

18         to -- I'm obviously trying to do it in a

19         way that doesn't interrupt the flow of

20         the deposition.  I just wanted to let

21         you know.

22              MR. WEINSTEIN:  Right.  Thank you.

23         I appreciate that, and we'll accommodate

24         any needs there.

25         Q    Mr. Markowitz, my name is Marc
```

1          And ultimately they didn't find you

2    another leverage provider?

3          MR. BONGIORNO:  Objection.

4      A    I disagree with the premise of your

5    question.

6      Q    Okay.  Ultimately, were they able

7    to provide -- to find another leverage

8    provider?

9      A    No.

10     Q    Can you turn, please, to

11   Exhibit 2116?

12          MR. WEINSTEIN:  Mark this as 2116.

13          (Whereupon the above mentioned was

14      marked for Identification.)

15          MR. BONGIORNO:  Marc, maybe after

16      you finish with this one, we can take

17      our next break?

18          MR. WEINSTEIN:  Yeah.

19     Q    So Mr. Shah sends you an e-mail in

20   April of 2012 asking if you have a pension

21   fund in the U.S. that can be used for trading

22   equities and derivatives.

23          Do you recall receiving that from

24   him?

25     A    Yes.

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 138

```
1          Q     At the time that you got it, did

2     you have a pension fund in the U.S. that

3     could be used for trading equities and

4     derivatives?

5          A     I don't recall.

6          Q     Okay.  Did you understand that this

7     question was in the context of dividend --

8     the dividend arbitrage strategy?

9          A     Yes.

10         Q     Do you recall what your response

11    was to Mr. Shah?

12         A     No.

13         Q     Did you end up setting up a pension

14    fund in the U.S. to be used for trading

15    equities or derivatives as part of a dividend

16    arbitrage strategy?

17         A     Yes.

18         Q     Okay.  And what pension plans did

19    you set up to be used for that purpose?

20         A     RJM Capital Pension Plan, among

21    others.

22         Q     When was RJM Capital Pension Plan

23    established?

24         A     Sometime in 2013.

25         Q     Okay.  Did -- along with your
```

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

1    brokers were going to go find the liquidity

2    for these trades in the marketplace?

3        A    From sellers of shares.

4        Q    Okay.  Where did you expect they

5    were going to find these sellers?

6        A    In all the dividend arbitrage

7    strategies we had looked at and participated

8    in, that was up to the brokers to find that

9    liquidity, given the economics of the trade

10   and the advantage of dividend arbitrage.

11           As I said, profitability could be

12   shared.  The sellers could have been other

13   investors who were not entitled to the tax

14   benefits.  They could have been short

15   sellers, long sellers.

16           So the source of the stock was up

17   to the brokers and the sellers to obtain

18   based on market liquidity.

19       Q    Okay.  And was it your

20   understanding that the sellers in each case

21   would be executing on the Solo platform?

22       A    We were informed by Solo that other

23   counterparty to the trade would likely be

24   customers of Solo as well.

25       Q    Okay.  And is that -- that's true

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

1    for the sellers of the shares?

2         A    Yes.

3         Q    Okay.  And so was it your

4    understanding that the sellers of the shares

5    were going to be customers of Solo?

6         A    Yes.

7         Q    Was that also true for the forward

8    or future counterparties?

9         A    Yes and no.

10        Q    Yeah, let me withdraw that.

11             Was that going to be true with

12   respect to the forward counterparties?

13        A    Yes.

14        Q    Okay.  Was that also going to be

15   true with respect to the stock lending

16   counterparties?

17        A    Yes.

18        Q    Okay.  And so, when you say the

19   brokers were going to go out into the market,

20   the market that they were going to go into

21   was the Solo customer list.

22             Correct?

23        A    Again, they could have gone to the

24   Solo customers or other customers if they

25   wanted to.  There was no limit placed.

1   plan get the seller his or her 50 percent

2   profit on the deal?

3       A    Again, the plan didn't pay the

4   money to the seller.  The plan paid the money

5   or a fee, as was previously negotiated, to a

6   company called Ganymede Investments, I

7   believe, and would have received an invoice

8   for that.

9           And it was up to Ganymede to

10  distribute those funds, if needed, to other

11  counterparties.

12      Q    What was Ganymede?

13      A    A company.

14      Q    Okay.  Was it a company that you

15  had ever heard of prior to starting this

16  dividend arbitrage trading strategy with Solo

17  Capital?

18      A    No.

19      Q    Okay.  Did you do any due diligence

20  on Ganymede prior to doing any transactions

21  with it?

22      A    Patriot Act, AML, and basic

23  information on the owners of the company.

24      Q    Okay.  What information did you

25  obtain on the owners of the company,

Confidential — Subject to The Protective Order
Richard Markowitz — April 8, 2021

Page 201

1    Ganymede?

2         A    I believe it was owned by Sanjay

3    Shah.

4         Q    Okay.  And so Mr. Shah told you

5    that?

6         A    We might have received corporate

7    documents that -- from wherever the company

8    was incorporated that showed that.

9         Q    Okay.  Do you know if you actually

10   did that, or did you just hear from Mr. Shah

11   that he owned it?

12        A    I don't recall which one it was at

13   this point.

14        Q    Okay.  What -- did Ganymede provide

15   services to any of the pension plans that you

16   were affiliated with?

17        A    The services would have been

18   assistance in the overall transaction, I

19   think, from our perspective, as I explained,

20   the amount of sharing of profit from the

21   trades and fees to Solo, similar to the

22   Merrill Lynch trade.  Those would be paid to

23   an entity designated by Solo.

24             And they designated Ganymede, and

25   it was up to that entity and Solo to decide

Confidential – Subject to The Protective Order
Richard Markowitz – April 8, 2021

Page 202

```
 1    how those fees would be parceled out.  But it
 2    was part of the overall construction of the
 3    trade.
 4        Q    Okay.  Other than facilitating
 5    getting the money to the right places, did
 6    Ganymede, the entity, provide services to the
 7    pension plans?
 8        A    I viewed Ganymede and Solo and
 9    Sanjay Shah as one entity.  So yes, in my
10    belief, there were significant services
11    provided in developing and becoming a
12    custodian at Solo Capital, and hiring all the
13    staff necessary to allow the custodian to
14    function, and to allow our pension plans or
15    other pension plans to execute these trades.
16        Q    Okay.  So you viewed Solo Capital
17    and Ganymede as interchangeable?
18        A    Yes.
19        Q    Okay.  And do you -- did you have
20    an understanding as to why you got an
21    instruction from Mr. Shah to use the Ganymede
22    entity on certain occasions as opposed to the
23    Solo Capital entity?
24        A    No.
25        Q    Okay.  Solo Capital had operations
```

```
 1    to this agreement, you were agreeing to pay

 2    Ganymede 66.67 percent -- I'm not even sure I

 3    said that right.

 4              Pursuant to this agreement, you

 5    were agreeing to pay Ganymede 66.67 percent

 6    of that refund amount that's in the schedule,

 7    but minus the Acupay fee.

 8              Correct?

 9        A    My understanding was that the

10    pension plan was entitled to 50 percent, the

11    other 50 to the seller, and we would pay to

12    Solo or its designee a 34 percent fee similar

13    to the arrangements we had at Broadgate.

14              The net result to the pension plan

15    is to retain approximately 34 percent of the

16    reclaim.  That's our understanding of any

17    fees that were paid.

18              It starts with a 50/50 split with

19    the seller.

20        Q    Okay.  I'm just asking what -- what

21    this agreement says.  And the agreement that

22    you signed with Ganymede was that the plan

23    would pay Ganymede 66.67 percent of that

24    refund amount in schedule -- in the schedule,

25    except that deducted from that refund amount
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 306

1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
2                    CASE NO.  18-MD-2865 (LAK)

3      _____
                                               )
4      IN RE:                                  )
                                               )
5      CUSTOMS AND TAX ADMINISTRATION OF       )
       THE KINGDOM OF DENMARK                  )
6      (SKATTEFORVALTNINGEN) TAX REFUND        )
       SCHEME LITIGATION                       )
7                                              )
       This document relates to case nos.      )
8      19-cv-01783; 19-cv-01788; 19-cv-01794; )
       19-cv-01798; 19-cv-01918                )
9      _____)

10

11

12                   C O N F I D E N T I A L

13             SUBJECT TO THE PROTECTIVE ORDER

14

15

16     CONTINUED REMOTE VTC VIDEOTAPED DEPOSITION UNDER

17                   ORAL EXAMINATION OF

18                   RICHARD MARKOWITZ

19                       VOLUME II

20                  DATE: April 9, 2021

21

22

23

24

25           REPORTED BY:  MICHAEL FRIEDMAN, CCR

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

1    R I C H A R D   M A R K O W I T Z,

2            called as a witness, having been first

3    duly sworn according to law, testifies as follows:

4

     CONTINUED EXAMINATION BY MR. WEINSTEIN:

5

6        Q    Mr. Markowitz, if you can turn to

7    Exhibit 2133, please?

8            Did each of the partnerships listed

9    in this exhibit earn profits from the Danish

10   dividend arbitrage strategy?

11       A    (Witness reviewing.)

12           MR. BONGIORNO:  Objection.

13       A    I don't recall.

14       Q    Did the partnerships earn profits

15   from any other investing activity other than

16   the Danish dividend arbitrage strategy?

17       A    Yes.

18       Q    What other investment strategies

19   did these partnerships earn money from?

20       A    Dividend arbitrage investments.

21       Q    So their profits were generated

22   entirely by dividend arbitrage strategies?

23       A    Yes.

24       Q    Did those strategies involve

25   Denmark and Belgium?

Confidential — Subject to The Protective Order
Richard Markowitz — April 9, 2021

Page 354

```
 1        can establish pension plans to participate in

 2        the dividend arbitrage strategy?

 3             A     No.

 4             Q     Okay.  So you had thoughts that you

 5        would do business using the LLCs.

 6                   Right?

 7             A     That is certainly one function of

 8        those LLCs.

 9             Q     Okay.  And how many LLCs were you

10        intending to have set up?

11             A     At the time, in discussions with

12        Solo Capital about market liquidity and

13        capacity, and to spread that liquidity in our

14        allocation among our allocation of the market

15        liquidity among clients, I think we were

16        intending somewhere between 30 and 40 pension

17        plans would be established.

18             Q     Okay.  But the number of pension

19        plans and LLCs that would be set up were

20        based on what Sanjay Shah and Solo told you

21        would be a market allocation for the dividend

22        arbitrage strategy?

23             A     No.  The overall allocation would

24        be indicated to us or forecasted.  It was up

25        to us to decide if we wanted to spread that
```

```
1    opportunity to two additional individuals.

2         Q    Okay.  And those are Ms. Jones and

3    Mr. Herman?

4         A    Yes.

5         Q    Okay.  And they are related to you?

6              MR. BONGIORNO:  Objection.

7         A    Yes.

8         Q    So after Mr. –– after Solo Capital

9    informed you that there was additional

10   capacity for the trading, LLCs and pension

11   plans were set up for Ms. Jones and

12   Mr. Herman?

13        A    Yes.

14        Q    And did they each have three LLCs

15   and pension plans set up?

16        A    Yes.

17        Q    Okay.  So, ultimately, there was a

18   group of 40 plans that were trading using

19   this strategy.

20             Is that right?

21        A    Yes.

22        Q    Were –– three of the new plans that

23   were set up were set up on your behalf.

24             Is that right?

25        A    Yes.
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

Page 379

```
 1      that role?

 2          A    I don't recall.

 3          Q    Well, did Mr. Ben-Jacob -- well,

 4      withdrawn.

 5               Did Kaye Scholer assist with the

 6      establishment of the new LLCs and pension

 7      plans?

 8          A    Yes.

 9          Q    Okay.  And was that true for all 40

10      of the new LLCs and pension plans?

11          A    No.

12          Q    And not all of them were new.

13               Is that correct?

14          A    Yes.

15          Q    Okay.  So, of the 40 LLCs and

16      pension plans, for those that were newly

17      established in 2014, did Kaye Scholer assist

18      in establishing them?

19          A    Yes.

20          Q    Was it your understanding that each

21      of the plan participants for those new

22      pension plans signed a similar limited power

23      of attorney granting Mr. Ben-Jacob the power

24      to do the same things?

25          A    I don't recall.
```

```
 1        A    We received advice that explained

 2    the issues surrounding that related to a

 3    different jurisdiction in Denmark, and that

 4    it created additional tax risk for the

 5    pension plans.

 6        Q    Okay.  Can you turn, please, to

 7    Exhibit 1829?

 8             MR. BONGIORNO:  Day 1, Volume 1.

 9        Q    This e-mail from you is about

10    Danish reclaim payments received from Syntax.

11             Is that right?

12        A    Yes.

13        Q    And you say in the e-mail that "the

14    amounts on the spreadsheet were sent to each

15    plan's respective custodian, and then

16    75 percent of the gross reclaim was paid out

17    to Ganymede."

18             And in 2015, why was 75 percent of

19    the gross reclaim paid out to Ganymede?

20        A    In late 2014, after the partners of

21    Argre decided not to work together, we

22    weren't sure we would be able to continue

23    doing business with Solo Capital or its

24    related entities.

25             And as I mentioned, two of my
```

```
1     former partners, Mr. Stein and Mr. Lhote, had

2     decided to go off and do business on their

3     own.  And they had acquired North Channel

4     Bank, got authorizations to have it act as a

5     custodian, had decided to work with former

6     employees of Solo, and were going to be

7     effectively competing in this dividend

8     arbitrage marketplace.

9             So with respect to Solo Capital,

10    where Mr. Van Merkensteijn and myself, and

11    ultimately Mr. Klugman, preferred to continue

12    our relationship and client business, we had

13    discussions that initially were tense because

14    Mr. Shah thought that Mr. Van Merkensteijn

15    and myself were investors in the bank, aware

16    of the developments, were going to be

17    competing.

18            And we assured them that that was

19    farthest from the truth.  We had no

20    relationship with that, we're not aware of

21    it, or became aware of it at the time that

22    Argre Management effectively dissolved.

23            And Mr. Shah said that he would

24    consider allowing us to participate as

25    customers and clients with different
```

Confidential - Subject to The Protective Order
Richard Markowitz - April 9, 2021

1    entities, those that were no longer

2    affiliated with or related to Mr. Stein

3    and -- Mr. Stein and Mr. Lhote, and the

4    economics would most likely change because

5    there would be additional competitors in the

6    marketplace, North Channel Bank, the ability

7    to get liquidity in shares would be impacted,

8    and that we would be -- the pension plans

9    would be receiving a lower percentage based

10   on the market pricing and the fees paid to

11   the other counterparties.

12           And that became 66 percent to

13   75 percent that would be paid away by the

14   pension plans because of this market

15   development, and perhaps Mr. Shah being upset

16   and associating Mr. Van Merkensteijn and

17   myself with the actions of my former

18   partners.

19       Q    So, in this particular case, adding

20   competitors into the market actually drove up

21   the fee as opposed to the additional

22   competitors usually driving a fee down?

23       A    No.  Additional competitors in the

24   marketplace drive up the cost of borrowing

25   shares if it's a stock lending transaction,