**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to:<br>19-cv-01785; 19-cv-01867; 19-cv-01893;<br>19-cv-01781; 19-cv-01783; 19-cv-01866;<br>19-cv-01895; 19-cv-01794; 19-cv-01865;<br>19-cv-01904; 19-cv-01798; 19-cv-01869;<br>19-cv-01922; 19-cv-01800; 19-cv-01788;<br>19-cv-01870; 19-cv-01791; 19-cv-01792;<br>19-cv-01928; 19-cv-01926; 19-cv-01868;<br>19-cv-01929; 19-cv-01803; 19-cv-01806;<br>19-cv-01906; 19-cv-01801; 19-cv-01894;<br>19-cv-01808; 19-cv-01810; 19-cv-01809;<br>18-cv-04833; 19-cv-01911; 19-cv-01898;<br>19-cv-01812; 19-cv-01896; 19-cv-01871;<br>19-cv-01813; 19-cv-01930; 19-cv-01815;<br>19-cv-01818; 19-cv-01931; 19-cv-01918;<br>19-cv-01873; 19-cv-01924; 19-cv-10713. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**PLAINTIFF SKATTEFORVALTNINGEN'S**
**MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**SECOND PROFFER ON ADVICE OF COUNSEL EVIDENCE**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT.................................................................................................................................1

I.     PX1267 (Use of Separate Emails) .................................................................................2

II.    DX6030 & DX3329 (Payments to Ganymede) ...............................................................3

III.   DX3345 & DX6028 (Partnership Profit Split) .......................................................4

IV.  DX3242 & DX3264 (U.S. Regulatory, Compliance & Reporting Advice) ........................5

V.    DX3253 (Stock Lending Agreement)........................................................................6

VI.  PX59 & PX62 (Advice That the Transactions Work) .........................................................6

VII.  DX3180 & DX3181 (Ezra Academy Transactions) ............................................................7

VIII. DX5887 (Freshfields "Brochure")........................................................................7

IX.  DX4140 (Danish Share Ownership Regulatory Reporting) ................................................9

CONCLUSION.............................................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund
    Litig.*, No. 18-md-2865 (LAK), 2024 WL 4696085 (S.D.N.Y. Nov. 6, 2024)..........1, 2, 3, 6, 7

*Sec. & Exch. Comm'n v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) ....................................2, 7

*U.S. v. Bankman-Fried*, S5 22-cr-0673, 2024 WL 477043 (S.D.N.Y. Feb. 7, 2024)..............1, 2, 6

**Statutes and Rules**

Rule 401 ......................................................................................................................................2

Rule 403 ...............................................................................................................................1, 2, 8

Plaintiff Skatteforvaltningen ("SKAT") submits this memorandum of law in opposition to defendants' Second Proffer on Advice-of-Counsel Evidence (ECF Nos. 1391-1392).

## PRELIMINARY STATEMENT

Defendants proffer a raft of irrelevant, unfairly prejudicial, misleading, and cumulative evidence designed to bolster the improper inference that defendants must not have done anything wrong because they hired lawyers to advise on collateral aspects of their Solo transactions.  Mr. Markowitz already has testified about these transactions, including much about Kaye Scholer's involvement, for the better part of three days.  Recalling him to the stand to elicit further testimony about Kaye Scholer's involvement or advice would be a waste of time and unfairly prejudicial to SKAT.  Nor is a Freshfields "brochure" about dividend arbitrage around the world of any relevance to this trial.

## ARGUMENT

As the Court explained, "defendants are not necessarily precluded from introducing evidence or argument concerning the impact of the advice of counsel or involvement of counsel on their good faith simply because they do not satisfy each of the *Williamson* factors required of the so-called advice-of-counsel defense." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-md-2865 (LAK), 2024 WL 4696085, at *5 (S.D.N.Y. Nov. 6, 2024).[1]  But "evidence of the role or presence of lawyers that falls short of satisfying all of the *Williamson* factors in some circumstances can pose particular risks of ills against which Rule 403 is intended to protect including a substantial risk of misleading the jury by suggesting to the jury that, because lawyers were involved in some degree with one aspect of

---

1.  The *Williamson* factors are whether the defendant "[1] made a complete disclosure to counsel concerning the matter at issue, [2] sought advice as to the legality of his conduct, [3] received advice that his conduct was legal, and [4] relied on that advice in good faith."  *U.S. v. Bankman-Fried*, S5 22-cr-0673 (LAK), 2024 WL 477043, at *2 (S.D.N.Y. Feb. 7, 2024).

events, the defendant was entitled to conclude that he was acting within the law with respect to some other aspect of events." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2024 WL 4696085, at *4.

For instance, such evidence "easily" could mislead a jury to "believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction." *Sec. & Exch. Comm'n v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013).  And that risk is heightened where, as here, "the proffered evidence is only collaterally related to the" conduct at issue "and is thus minimally probative." *Bankman-Fried*, 2024 WL 4770423, at *3.

Thus, "evidentiary rulings with respect to this sort of evidence must turn on careful assessments of the probative value of the proffered evidence and its balance against any risk of substantial unfair prejudice or other factors relevant under Rule 403." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2024 WL 4696085, at *4.  "And the four *Williamson* factors are germane to both the Rule 401 and 403 analyses insofar as they help a court to assess the probative value and danger of challenged evidence and weigh the one against the other." *Id.* at *5.

I.     **PX1267 (Use of Separate Emails)**

The Court should preclude defendants from introducing PX1267 (Dulberg Decl. Ex. 8) to supposedly "explain *why* [Markowitz] and his partners split out communications with brokers and custodians over 34 separate emails." (Defs. Br. 8.)  Kaye Scholer never provided any legal advice on this practice.  Rather, "[f]ollowing up on [a] call" with Mr. Larosa, Mr. Wells wrote, "[w]e agree it is probably a good idea," "assum[ing] that this strategy is administratively manageable on your end so as to be implemented and consistently employed." (PX1267 at 4.)

The exhibit thus has little, if any, probative value for the proffered purpose because it sheds no light on why the Argre partners thought this was a good idea in the first place. Indeed, neither Mr. Wells nor Mr. Larosa, the two participants in the referenced phone call, is going to testify at trial about the subject of the call. The exhibit's only purpose thus would be to suggest to the jury misleadingly that there must have been some legal reason behind it. Further, Mr. Wells' email is from January 2013, *i.e.*, 18 months before the trading instructions it supposedly explains and a time when defendants were using only 8, not 34, pension plans for the fake trading. Defendants should not be permitted to argue to the jury that those so-called trading instructions were crafted based on legal advice they never asked for or received.[2]

## II.    DX6030 & DX3329 (Payments to Ganymede)

Nor, as the Court ruled already, should defendants be allowed to introduce evidence of Kaye Scholer's advice on "tax and compliance issues surrounding the payment[s] due to Ganymede." (DX6030 (Dulberg Decl. Ex. 9); DX3329 (Dulberg Decl. Ex. 10).) Those "tax and complian[ce] issues" have nothing to do with this trial. (Weinstein Decl. Ex. 1 (Trial Tr.) 1041:16-1042:18.) Rather, the issue is whether defendants' payments of Solo's "fee" to an unregulated entity in the Cayman Islands that provided no services to them are indicia of fraud or should have tipped off defendants that something was amiss. (*Id.* at 1041:19-21 ("What we are talking about is whether your clients knew or should have known that Mr. Shah was operating a fraudulent scheme.").) The proffered evidence is irrelevant, and its only purpose would be to highlight Kaye Scholer's involvement.

---

2.    Defendants' argument that the exhibit falls under the Court's *in limine* ruling is meritless. (Defs. Br. 8.) The Court held that defendants may introduce evidence of Kaye Scholer's involvement or advice "to illustrate the mechanics of the trading strategy," *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2024 WL 4696085, at *4, not any such evidence that "relate[s] to the mechanics of the trading strategy." (Defs. Br. 8.)

**III.    DX3345 & DX6028 (Partnership Profit Split)**

Defendants' proffered evidence of Kaye Scholer's advice concerning the 95/5 profit split

for the friends and family plans is likewise inadmissible.  (DX3345 (Dulberg Decl. Ex. 11);

DX6028 (Dulberg Decl. Ex. 12).)  Defendants' argument to the contrary is based on two

mistaken premises.  As an initial matter, SKAT's theory of the case is that the refund claims

were fraudulent because, as defendants concede, there were no shares or dividends, not because

the friends and family plans' interests in the partnerships' "profits" were too small.  (Defs. Br. 9-

10.)

And, in any event, Kaye Scholer never "assured" defendants that the plans could make

the beneficial ownership representations.  (Defs. Br. 9.)  While the question of "whether the

Pension Plan can represent that it is the beneficial owner of the tax reclaims given the general

partnership structure" was raised; it was never answered.  (DX3345 at 2.)  Markowitz admitted

as much at his deposition.  (Weinstein Decl. Ex. 2 (Markowitz Dep. Tr.) at 494:3-13 (answering

that he was unable to identify an answer from Kaye Scholer that the plans could represent

themselves as the beneficial owners).)[3]

The proffered evidence is not all probative of why defendants enlisted their friends and

family to establish multiple pension plans to participate in the fraudulent trading, while keeping

the lion's share of the "profits" for themselves.  Its only point would be "to set up the [improper]

---

3.  Nor is any advice Kaye Scholer provided on "the lowest percentage that the Pension Plan can contribute to the
    general partnership so that the partnership is respected for regulatory purposes" at all relevant to defendants'
    good faith.  (DX3345 at 2.)  Whether the partnerships would be recognized for some unspecified "regulatory
    purposes" has nothing to do with whether defendants knew or should have known they were participating in a
    fraud.  Moreover, at his deposition, Markowitz did not even know what "regulatory purposes" the exhibit
    referred to.  (Weinstein Decl. Ex. 2 (Markowitz Dep. Tr.) at 489:3-5 (Q. "Do you know what regulatory
    purposes are being asked about here?"  A. "No.").)

argument, whether made only implicitly or explicitly, that how could [defendants] have done anything wrong, look at all these lawyers." (Weinstein Decl. Ex. 1 (Trial Tr.) 1039:8-12.)

## IV.    DX3242 & DX3264 (U.S. Regulatory, Compliance & Reporting Advice)

The proffered evidence concerning U.S. regulatory, compliance and reporting requirements is cumulative of Markowitz's irrelevant testimony already in the record. (DX3242 (Dulberg Decl. Ex. 14); DX3264 (Dulberg Decl. Ex. 15).) Defendants argue the evidence demonstrates "their willingness to go forward with the transactions, knowing from the beginning that significant disclosure was required." (Defs. Br. 12.) But Markowitz testified already that defendants "had to make significant disclosures to the U.S. government for both the amount of trading we did on a monthly basis, the holdings we had, and we also had to do certain tax filings for balances in our accounts in a foreign country like the UK." (Weinstein Decl. Ex. 1 (Trial Tr.) 1190:1-8.) And that he learned about these requirements in "[e]ither late 2011, perhaps early 2012," when he "received from a number of law firms . . . courtesy memos . . . that highlighted and summarized a new set of reporting requirements." (*Id.* at 1190:9-24.)[4]

Whatever the probative value of that testimony, the proffered emails between Markowitz and Mr. Ben-Jacob about these reporting requirements add little more. And as the Court already concluded, the evidence is irrelevant in any event. SKAT's argument is that defendants hid their fraud from the Danish government, not the U.S. government. (Weinstein Decl. Ex. 1 (Trial Tr.) 1192:2-1193:2). Allowing Markowitz to testify again about these matters would be needlessly cumulative, with the only purpose being to show more evidence of Kaye Scholer's involvement in collateral issues.

---

4.   *See also id.* at 1190:19-24 ("But we knew in 2011/2012 that if you were purchasing securities with or through foreign custodians . . . . [t]he treasury department and the U.S. government wanted to have a record of that and knowledge of that.").

## V.    DX3253 (Stock Lending Agreement)

That defendants' lawyers reviewed stock lending agreements has little, if any, relevance to their good faith.  (DX3253 (Dulberg Decl. Ex. 16).)  SKAT's expert Mr. Wade acknowledged that these are standard industry documents—it is the terms of the individual stock loans themselves that were highly irregular.  (Weinstein Decl. Ex. 1 (Trial Tr.) at 1518:30-1522:23.)  And the proffered evidence does not rebut SKAT's argument that defendants failed to conduct due diligence on the stock loan counterparties.  Just the opposite, Markowitz noted in the proffered email that "we," *i.e.*, Argre, "should ask Aquila for due diligence information on themselves."  (DX3253 at 1.)  And "on the other hand," the proffered evidence and testimony would "threaten[] to confuse the jury by suggesting, incorrectly, that the involvement of attorneys in those collateral activities"—reviewing stock loan agreements—"would  have provided a reasonable basis for defendant[s] believing that" the stock loans themselves were real.  *Bankman-Fried*, 2024 WL 4770423, at *3.

## VI.    PX59 & PX62 (Advice That the Transactions Work)

The Court previously held that evidence of "Kaye Scholer's legal advice" on "issues of U.S. law" is "clearly irrelevant to defendants' mental states" in making the false share ownership representations to SKAT.  *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, 2024 WL 4696085, at *4.  Nevertheless, defendants proffer just the sort of evidence the Court specifically disallowed, including a Kaye Scholer memorandum on U.S. law tax issues, U.S. law pension qualification and compliance issues, and U.S. law investment advice and securities related issues, including under the Investment Advisers Act and the Dodd-Frank Act.  (PX59 (Dulberg Decl. Ex. 17) at 2.)  And an email from Mr. Ben-Jacob explaining, "while we still think the transactions work, we don't think we can issue an opinion that would be of real value."  (PX62 (Dulberg Ex. 18) at 1.)  Of course, Mr. Ben-Jacob did not mean that "the

transactions work" from a Danish law perspective because Kaye Scholer provided no Danish law advice. Nor did Mr. Ben-Jacob purport to opine on whether any pension plan actually purchased any stock, the key issue in this trial. Defendants should not be permitted to misleadingly suggest to the jury that lawyers "blessed" the transactions because Kaye Scholer advised the defendants that "the transactions work" from the perspective of the U.S. law issues they considered. *See Tourre*, 950 F. Supp.2d at 684.

## VII.    DX3180 & DX3181 (Ezra Academy Transactions)

The proffered evidence concerning defendants' supposed disclosure to Kaye Scholer of "granular details" concerning the Ezra German trading is plainly irrelevant. (DX3180 (Dulberg Decl. Ex. 1); DX3181 (Dulberg Decl. Ex. 2).) Ezra never submitted a reclaim application to Denmark. It is also cumulative. Markowitz already has testified extensively regarding his understanding of the Ezra transactions and why they supposedly did not give him concern regarding further transactions with Solo, including with repeated references to Ben-Jacob and other attorneys at Kaye Scholer. (*See* Weinstein Decl. Ex. 1 (Trial Tr.) at 1018:15-1020:21, 1024:5-1029:3, 1056:16-1059:11, 1065:5-1066:1.) The proffered exhibits and testimony would be a waste of time that could only serve to confuse and mislead the jury with more irrelevant evidence of Kaye Scholer's involvement.

## VIII.    DX5887 (Freshfields "Brochure")

The Court should exclude defendants' proposed exhibit DX5887 (Dulberg Decl. Ex. 19)—an 80-page "brochure" published by Freshfields in March 2012 summarizing the laws in a host of countries (but not Denmark) relevant to dividend arbitrage—as irrelevant, unfairly prejudicial, misleading, confusing, and a waste of time. The Court already excluded the substance of any German or Belgian law advice defendants received as "irrelevant" and "unfairly prejudicial and misleading." *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT)*

7

*Tax Refund Litig.*, 2024 WL 4696085, at *7.  There is no reason the result should be any

different for Freshfields' marketing brochure about Germany, Belgium and a multitude of other

countries' laws.

Defendants argue that the brochure bolsters Markowitz's testimony "that the concerns

expressed by large institutions about dividend arbitrage strategies related to reputational risk, not

the legality of the trading itself."  (Defs. Br. at 15.)  Putting aside that Markowitz would have no

foundation to know the actual reasons behind any financial institution's decision to avoid doing

business with Solo, the legality of real dividend arbitrage trades around the world (or even in

Denmark) is not at issue in this trial.[5]  Defendants concede that the Solo trading was fraudulent.

And even assuming for argument's sake that the document had some minimal probative value, it

should be excluded under Rule 403 as likely to confuse and mislead the jury.

Its admission would also waste time because SKAT would dispute Markowitz's supposed

reliance on the brochure by introducing evidence regarding the details of subsequent

communications between Markowitz and Freshfields partner Axel Haelterman, an author

credited in the Belgian law section of the brochure.  For example, on April 23, 2012, Haelterman

asked Markowitz whether he "would still be interested in receiving the worked out version of the

[Belgian law] memo" "given the manner in which [Freshfields] ha[d] to phrase [its]

observations."  (Weinstein Decl. Ex. 3 at 1.)  Specifically, Freshfields explained that the wording

"reflects the fact . . . that the presence of, as we are told, a relevant number of short sellers in the

market makes the legal basis for invoking a dividend withholding tax exemption somewhat

doubtful."  (*Id.*)  And the enclosed memorandum provides that "[g]iven the level of

---

5.  Indeed, defendants objected on that ground to SKAT's expert Mr. Wade answering questions about his
    opinions, based on his market experience, on the types of dividend arbitrage transactions that defendants
    purported to do in Germany, Belgium, and Denmark.  (Weinstein Decl. Ex. 1 (Trial Tr.) at 1528:9-1532:4.)

aggressiveness of the trades, essentially at the side of buyers seeking a withholding tax

exemption in a market where they should be aware that short-selling is ongoing . . . . [t]his memo

can not be read or construed to contain any recommendation of or approval for such trades which

do lead to some legal uncertainty regarding the availability of the exemption that is intended to

be invoked." (*Id.* at 3.)

### IX.    DX4140 (Danish Share Ownership Regulatory Reporting)

Advice Mr. Ben-Jacob provided concerning "disclosure/reporting requirements for a

holder of shares in a public company in Denmark" has minimal, if any, probative value.

(DX4140 (Dulberg Decl. Ex. 20).)  Such advice is particularly peripheral because Mr. Ben-Jacob

advised Markowitz that his "own conclusion would be not to file," in part because "the Danish

FSA has no authority beyond its borders, has no authority to criminally prosecute, and they are

not a party to any treaties that would permit them to call upon the assistance of the U.S." (*Id.* at

2.)  And the risk of unfair prejudice to SKAT is substantial because it may lead the jury to

believe (mistakenly) that Kaye Scholer was providing, or relaying, Danish law advice on other

issues.

Further, the evidence shows Markowitz's desire to avoid any such reporting requirement,

and Mr. Ben-Jacob's assistance in reaching that result.  It is beyond clear in this case that the

pension plans coordinated and purported to trade as a group, which circumstances likely result in

a reporting requirement.  (*See id.* at 3 ("the FSA has on numerous occasions made it clear that

such 'agreement' can be quite informal and indeed it seems that if parties are somehow closely

connected through business association in other ways, there is a strong presumption that such

parties are acting in concert").)  Yet, defendants decided not to report in Denmark.  (*See id.* at 4

("I suppose the real question is to make sure the Plans are somehow not acting in concert so that

we would not have to aggregate across plans.").)  This proffered evidence does not demonstrate

9

that the defendants "took measures to ensure cooperation with relevant reporting requirements and rules," (Defs. Br. 15), but rather the opposite.[6]

## **CONCLUSION**

For the reasons set forth above, SKAT respectfully requests that the Court deny the defendants' request to introduce and elicit testimony concerning proposed exhibits PX1267, DX3329, DX6030, DX3345, DX6028, DX3247, DX3242, DX3264, DX3253, PX59, PX62, DX3180, DX3181, DX5887, and DX4140 for the purpose stated in defendants' proffer.

Dated: New York, New York            HUGHES HUBBARD & REED LLP
      January 26, 2025

By: /s/ Marc A. Weinstein
      William R. Maguire
      Marc A. Weinstein
      Neil J. Oxford
      Dustin P. Smith
      Gregory C. Farrell
      One Battery Park Plaza
      New York, New York 10004-1482
      Telephone: (212) 837-6000
      Fax: (212) 422-4726
      bill.maguire@hugheshubbard.com
      marc.weinstein@hugheshubbard.com
      neil.oxford@hugheshubbard.com
      dustin.smith@hugheshubbard.com com
      gregory.farrell@hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen (Customs and Tax Administration of the Kingdom of Denmark)*

---

6.    Defendants' proffer concerning DX3247 (Dulberg Decl. Ex. 13) (Plan Names) is moot.  This exhibit was admitted into evidence, with no objection from SKAT, on January 21.

282419403